89 N.Y.2d 172 (1996)
674 N.E.2d 1129
652 N.Y.S.2d 223
Ricky Brown et al., Appellants,
v.
State of New York, Respondent.
Court of Appeals of the State of New York.
Argued September 4, 1996
Decided November 19, 1996.
Whiteman Osterman & Hanna, Albany (Scott N. Fein, Paul C. Rapp, Philip H. Dixon, D. Scott Bassinson and Lisa M. Codispoti of counsel), for appellants.
Dennis C. Vacco, Attorney-General, Albany (Denise A. Hartman and Peter H. Schiff of counsel), for respondent.
James A. Gardner, Stephentown, Christopher Dunn, New York City, and Norman Siegel for New York Civil Liberties Union, amicus curiae.
Stenger and Finnerty, Buffalo (Michael L. Jackson of counsel), and Michael Deutsch, New York City, for Center for Constitutional Rights, amicus curiae.
Chief Judge KAYE and Judges TITONE, SMITH and CIPARICK concur with Judge SIMONS; Judge BELLACOSA dissents in part and votes to affirm in a separate opinion; Judge LEVINE taking no part.
*175 SIMONS, J.
This is a purported class action brought on behalf of nonwhite males who were stopped and examined by police officers between September 4, 1992 and September 9, 1992 while the police were investigating a crime in the City of Oneonta. *176 The claimants seek monetary damages from the defendant alleging illegal and unconstitutional acts by the State of New York, the New York State Police, the State University of New York and the State University of New York, College at Oneonta (SUCO) and various officers and employees of those entities.
Before answering, the State moved to dismiss alleging that the claim was facially defective because the court lacked subject-matter jurisdiction and the claim failed to state any cause of action. The Court of Claims granted the motion, holding (a) that constitutional torts are not cognizable in the Court of Claims; (b) that direct actions for violations of the New York State Constitution's Bill of Rights, specifically the right to be free from unreasonable searches and seizures and the right to equal protection under the law, are not cognizable claims in any court in the State absent some link to a common-law "traditional" tort; (c) that actions for negligent training and supervision are not cognizable claims in the Court of Claims where the underlying harm  in this case, constitutional violations  are themselves not matters within the court's jurisdiction; and (d) that actions based on 42 USC § 1981 do not lie against States. The Appellate Division affirmed.
The primary issues presented to this Court are whether, absent either a statute expressly authorizing such claims or a traditional common-law tort theory supporting money damages, the Court of Claims has subject-matter jurisdiction of these tort claims against the State and whether claimants state causes of action against defendant based upon rights secured to them by the State and Federal Constitutions and various State statutes.
The order should be modified. The Court of Claims has subject-matter jurisdiction of the claim. Notwithstanding jurisdiction to hear claims based on 42 USC § 1981, however, claimants do not state causes of action under that statute. The causes of action seeking damages based upon provisions of the New York Constitution are facially sufficient and should be reinstated. For purposes of deciding this appeal, we assume the truth of the factual allegations asserted by claimants.

I
The claims arise out of an incident occurring in the early morning of September 4, 1992 when a 77-year-old white woman was reportedly attacked at knifepoint in a house outside Oneonta city limits, near the State University campus. The *177 victim described her assailant as a black male and police determined that he may have cut his hand during the alleged attack.
Having failed to identify a suspect during the morning following the attack, the New York State Police and SUCO security personnel prevailed upon SUCO officials to prepare a computer generated list from the University computer system containing the name and address of every African-American male attending the University. Using this list, State Police, SUCO security personnel and local law enforcement officers sought to question each student named on it. African-American students were interrogated in their dormitories, on the SUCO campus, in off-campus apartments and on the streets in and around the City of Oneonta. The interrogations were systematic, consisting of a "stop" followed by questions regarding potential involvement in the incident, requests for alibis, and an inspection of the students' hands and forearms.
When these efforts failed to yield any suspects, the State Police and local law enforcement officials embarked on a five-day "street sweep" in which every nonwhite male found in and around the City of Oneonta was stopped and similarly interrogated. In the nearly four years since the incident, no one has been arrested for the crime.
Claimants instituted this action asserting that the conduct of defendants was racially motivated and denied them rights guaranteed by the State and Federal Constitutions.[1]

II
These claims sound in constitutional tort.[2] Analysis starts by defining what is meant by that term.
A constitutional tort is any action for damages for violation of a constitutional right against a government or individual defendants. Constitutional tort claims were first recognized after the Civil War when Congress authorized civil damage actions against those "who, under color of" State law or custom, have deprived others of constitutional rights (Act of Apr. 20, 1871, ch 22, § 1, 17 US Stat 13). *178 Those statutes, now codified in 42 USC § 1981 et seq. remained relatively obscure until the 1961 decision of the Supreme Court in Monroe v Pape (365 US 167). In Monroe, the Court held that a plaintiff whose constitutional rights have been infringed by one acting under color of State law can bring a Federal action under section 1983 even where the State provides an adequate remedy at common law (but see, Whitman, Constitutional Torts, 79 Mich L Rev 5, 8). The statute was intended to create "a species of tort liability" in favor of persons deprived of their constitutional rights (see, Carey v Piphus, 435 US 247, 253 [quoting Imbler v Pachtman, 424 US 409, 417]).
In addition, in 1971, the Supreme Court recognized a cause of action for damages based upon duties defined in the Federal Constitution (see, Bivens v Six Unknown Fed. Narcotics Agents, 403 US 388). The Court did not predicate recovery on the civil rights statutes but implied a cause of action for damages based on the guarantees against unlawful searches and seizures contained in the Fourth Amendment. A number of States have similarly recognized causes of action against individuals and governments for constitutional torts based upon local law (see, e.g., Widgeon v Eastern Shore Hosp. Ctr., 300 Md 520, 479 A2d 921; Gay Law Students Assn. v Pacific Tel. & Tel. Co., 24 Cal 3d 458, 595 P2d 592; Phillips v Youth Dev. Program, 390 Mass 652, 459 NE2d 453; Newell v City of Elgin, 34 Ill App 3d 719, 340 NE2d 344; see generally, Friesen, State Constitutional Law ¶ 7.05 [2]; and see, ¶ 7.07 [1] [for a list of States viewing favorably damage remedies for violation of State constitutional provisions]).
Although the Supreme Court has drawn on common-law principles to define the scope of liability in these actions, and constitutional and common-law torts frequently protect similar interests, the causes of action are not coextensive (see generally, Whitman, op. cit., at 14; Wells and Eaton Substantive Due Process and the Scope of Constitutional Torts, 18 Ga L Rev 201, 233; and see, Carey v Piphus, 435 US, at 258, supra). The common law of tort deals with the relation between individuals by imposing on one a legal obligation for the benefit of the other and assessing damages for harm occasioned by a failure to fulfill that obligation (Prosser and Keeton, Torts § 53, at 356 [5th ed]). Common-law duties arise in virtually all relationships and protect against most risks of harm. Constitutional duties, by contrast, address a limited number of concerns and a limited set of relationships. Constitutions assign rights to *179 individuals and impose duties on the government to regulate the government's actions to protect them. It is the failure to fulfill a stated constitutional duty which may support a claim for damages in a constitutional tort action.
Claimants ask that we recognize a damage remedy against the State based on the New York Constitution as Congress, the Supreme Court and several State courts have done before us based on the Federal and State Constitutions.

III

Jurisdiction
The first question presented is the jurisdiction of the Court of Claims to entertain constitutional tort claims.
Under the common law, a State is immune from suit unless it waives its sovereign immunity. The provisions applicable here are contained in article VI, § 9 of the State Constitution, which continues the Court of Claims and authorizes the Legislature to determine its jurisdiction, and the Court of Claims Act, which contains the waiver of immunity and the jurisdictional and procedural provisions necessary to implement the constitutional section. The Court of Claims declined to exercise jurisdiction in this case because it believed the statutes were not sufficiently broad to waive the State's immunity from suit for constitutional torts.
Sovereign immunity has been described as an "outmoded" holdover of the notion that the King can do no wrong (Breuer, The New York State Court of Claims: Its History, Jurisdiction and Reports, at 13). While the State and its agencies must pay for property taken for public purposes, in the absence of consent, immunity is otherwise a complete protection under the common law (see generally, Restatement [Second] of Torts § 895B). In the past, New York waived immunity and compensated aggrieved parties for very few claims and they were adjusted by a variety of tribunals with limited jurisdiction. Any others were satisfied, if at all, by private bills addressed to the Legislature's sense of justice. The inequity and inefficiency of such a system became apparent over time and the method for handling claims against the State has gradually evolved to the present system in which jurisdiction over such matters is vested in the Court of Claims (see, Breuer, op. cit., at 13 et seq. for a history of the subject).
The present Court of Claims Act was adopted in 1939. One commentator observed, it confers jurisdiction on the court to *180 hear and determine "almost every conceivable kind of action against the State" (see, Breuer, op. cit., at 23). Subdivision (2) of section 9 of the present Act confers jurisdiction on the court "[t]o hear and determine a claim of any person, corporation or municipality against the state for the appropriation of any real or personal property or any interest therein, for the breach of contract, express or implied, or for the torts of its officers or employees while acting as such officers or employees".
In Smith v State of New York (227 N.Y. 405, 409-410, rearg denied 229 N.Y. 571), we stated as a general rule that the jurisdiction of the Court of Claims is to be construed broadly and waiver of immunity narrowly. Claimant in Smith sought damages from the State for personal injuries allegedly sustained as the result of the State's negligence. We construed section 264 of the Code of Civil Procedure, a predecessor to section 9, as granting the Court of Claims jurisdiction of the matter, stating that its jurisdiction was of the "broadest character" (at 409). We denied liability, however, concluding that although the State had waived its immunity from suit, it had not waived its immunity from liability: the Court had jurisdiction to hear the claim, but the claim failed because the State had not waived its substantive liability (id., at 409-410).
The jurisdiction of the Court of Claims is today, as it was characterized in Smith, of the "broadest character", but the Smith Court's interpretation of the waiver provision of section 264 was at odds with the public policy which seeks to reduce rather than increase the obstacles to recovery of damages, whether defendant is a private person or a public body (see, Abbott v Page Airways, 23 N.Y.2d 502, 507; see also, Bing v Thunig, 2 N.Y.2d 656, 666 ["(l)iability is the rule, immunity the exception"], quoted with approval in Abbott, supra, at 507, n 2). Thus, the Legislature subsequently enacted a new statute to overcome the ruling in Smith. That revision, the substance of which was incorporated into the statute now before us, "extended, supplemented and enlarged" the waiver to remove the defense of sovereign immunity for tort actions (Jackson v State of New York, 261 N.Y. 134, 138, rearg denied 261 N.Y. 637; see, Breuer, op. cit., at 27). The present statute provides:
"[t]he state hereby waives its immunity from liability and action and hereby assumes liability and consents to have the same determined in accordance with the same rules of law as applied to actions in the supreme court against individuals or *181 corporations" (Court of Claims Act § 8 [emphasis added]).
The waiver includes all claims over which the Court of Claims has jurisdiction  appropriation, breach of contract and torts  and applies the rule of respondeat superior to the State (see, Court of Claims Act § 9 [2]; Jackson v State of New York, supra, at 138).[3]
The State contends that the waiver is limited to traditional common-law torts. It notes that damage actions under the Federal civil rights statutes, although authorized following the Civil War, were virtually unknown until well after the Court of Claims Act was enacted and damage claims brought directly under the Federal Constitution against Federal officials were not formally recognized until Bivens was decided in 1971. Thus, the State reasons, it cannot be said that the Legislature intended to confer jurisdiction upon the Court of Claims to redress constitutional torts when it enacted the present statute.
In attempting to discover the legislative intention, it is well to recognize that the word tort has no established meaning in the law. Broadly speaking, a tort is a civil wrong other than a breach of contract (see, Prosser and Keeton, op. cit., § 1). There are no fixed categories of torts, however, and no restrictive definitions of the term (see, Advance Music Corp. v American Tobacco Co., 296 N.Y. 79; see also, Prosser and Keeton, op. cit.). Indeed, there is no necessity that a tort have a name; new torts are constantly being recognized (see, the extensive analysis by Justice Breitel, as he then was, in Morrison v National Broadcasting Co., 24 AD2d 284, revd on other grounds 19 N.Y.2d 453; see also, 16 ALR3d 1175). Tort law is best defined as a set of general principles which, according to Prosser and Keeton, occupies a "large residuary field" of law remaining after other *182 more clearly defined branches of the law are eliminated. (Prosser and Keeton, op. cit., § 1, at 2.)
Inasmuch as there is no clear definition by which wrongs are classified as torts, the Legislature could not have used the term when enacting section 9 (2) in 1939 with a precision that would limit the jurisdiction of the Court of Claims solely to common-law torts or those recognized at the time. It is more likely that the term was used generally to indicate a branch of the law broader than the then-existing categories and subject to expansion as new wrongs supporting liability were recognized.
Indeed, there is evidence that the Court of Claims accepts this view for it has entertained jurisdiction over new torts recognized after the Act was adopted (see, e.g., Doe v State of New York, 155 Misc 2d 286, 297-298, mod 189 AD2d 199 [applying the rule in Bovsun v Sanperi, 61 N.Y.2d 219 (1984)]) and it has frequently retained jurisdiction of claims seeking damages for constitutional torts in the past, albeit without discussion (see, Vaughan v State of New York, 272 N.Y. 102, appeal dismissed 300 US 638; Brenon v State of New York, 31 AD2d 776; Frady v State of New York, 19 AD2d 783; Periconi v State of New York, 91 Misc 2d 823; Dean v State of New York, 111 Misc 2d 97, affd 91 AD2d 805; Herman v State of New York, 78 Misc 2d 1025; Hook v State of New York, 15 Misc 2d 672). To be sure, there also have been Court of Claims decisions, most unpublished, denying jurisdiction to litigate constitutional wrongs, and the State would distinguish the cited cases as actions involving constitutional torts joined with common-law torts. That has not been uniformly true, however; some of the cited claims involved no common-law cause of action and others asserted separate causes of action involving only the violation of a constitutional duty and those constitutional tort claims were sustained (see, e.g., Dean, supra; Periconi, supra; Herman, supra).
The State also contends that the waiver contained in section 8 does not reach this claim because it is limited to liability actions similar to those which may be brought in Supreme Court against individuals and corporations (see, Court of Claims Act §§ 8, 12 [1]). Individuals and corporations, it claims, cannot be sued for constitutional violations.
Admittedly, there are few constitutional tort actions against individuals and corporations in Supreme Court because the Constitutions do not generally restrict the actions of private parties (see, e.g., SHAD Alliance v Smith Haven Mall, 66 N.Y.2d 496 *183 [holding that article I, § 8 of the State Constitution, which guarantees the right of free speech, does not apply to individuals or corporations]). There are, however, some constitutional provisions that explicitly regulate private conduct and the prohibition against discrimination contained in section 11 is one of them. Article I, § 11 prohibits discrimination by "any * * * person or by any firm, corporation, or institution, or by the state". Thus, the rights guaranteed by that constitutional provision may be enforced in Supreme Court to recover damages for private acts of discrimination although enabling legislation was required before the action could be maintained because the provision was not self-executing (see, Executive Law § 297 [9]; Civil Rights Law § 40-d).
Furthermore, the State and Federal courts have concurrent jurisdiction over constitutional tort claims asserted under the procedures authorized by the Federal civil rights statutes (see, Maine v Thiboutot, 448 US 1, 3, n 1; Martinez v California, 444 US 277, 283-284, n 7; 1 Friesen, op. cit., ¶ 7.03 [2]) and New York courts have consistently accepted jurisdiction of such claims against "individuals or corporations" (see, e.g., Town of Orangetown v Magee, 88 N.Y.2d 41; Cox v City of New York, 40 N.Y.2d 966; DiPalma v Phelan, 179 AD2d 1009, affd 81 N.Y.2d 754; Manti v New York City Tr. Auth, 165 AD2d 373; Clark v Bond Stores, 41 AD2d 620; see also, 1 Civil Actions Against State and Local Government, Its Divisions, Agencies and Officers §§ 7.90-7.97 [Shepards/McGraw-Hill, 2d ed]).
Thus, while the analogy between a government and an individual or corporation contained in sections 8 and 12 of the Act has some inherent limitations because individuals "do not do the same things in the same way as does the State" (Davison, Claims Against the State of New York, ¶ 11.03, at 76-77; and see, Newiadony v State of New York, 276 App Div 59), the causes of action asserted by claimants are sufficiently similar to claims which may be asserted by individuals and corporations in Supreme Court to satisfy the statutory requirement.
Accordingly, we conclude that the Court's jurisdiction is not limited to common-law tort causes of action and that damage claims against the State based upon violations of the State Constitution come within the jurisdiction of the Court of Claims.

*184 III

The Causes of Action

A
Claimants' first five causes of action[4] are based on violations of section 1981, the enabling act which provides a damage remedy for the deprivation of Federal constitutional rights.[5] We conclude they must be dismissed for failure to state causes of action.
In Monell v New York City Dept. of Social Servs. (436 US 658), the Supreme Court held that no suit would lie against the *185 State under section 1983 because the State was not a "person" within the meaning of the statute.[6] It also held that the doctrine of respondeat superior had no application in actions based on the statute. The Court reasoned that the State is not a "person" because a waiver of its immunity (whether based on the Eleventh Amendment or on historic common-law principles), must be expressly stated before a State may be sued in Federal courts (see, Will v Michigan Dept. of State Police, 491 US 58, 63-65).
Claimants have based their claims on section 1981. They maintain that section provides a basis of liability independent of section 1983. In Jett v Dallas Ind. School Dist. (491 US 701), however, the Supreme Court held that section 1983 provides the exclusive Federal damages remedy for violation of the rights guaranteed by section 1981. The State is not a "person" within the statute and it cannot be liable in an action based on section 1981 (Jett, supra, 491 US, at 731; Dennis v County of Fairfax, 55 F.3d 151, 156, n 1 [4th Cir 1995]; Tarpley v Green, 684 F.2d 1, 11, n 25 [DC App 1982], cited with approval in Jett, supra, at 735). Inasmuch as the Jett ruling controls claimants' first five causes of action they fail.
Claimants contend, that the Civil Rights Act of 1991, passed after the Jett decision, added subdivision (c) to section 1981 for the purpose of overruling the holding in Jett and providing a broader avenue of relief to claimants. The legislative history accompanying the Act does not address the Supreme Court's holding in Jett. It mentions subdivision (c) only briefly and states that it was added to reaffirm Runyon v McCrary (427 US 160 [holding private parties liable under 42 USC § 1981]; see, HR Rep No. 40 [I], 102d Cong, 1st Sess 92, 141, reprinted in 1991 US Code Cong & Admin News 630, 670). This rationale was not discussed in the Congressional Debate, however (137 Cong Rec S15473, S15483). Federal courts, with little legislative history to guide them, have held conflicting views as to whether the amendment was meant to overrule Jett (compare, *186 Ebrahimi v City of Huntsville Bd. of Educ., 905 F Supp 993, 995, n 2 [ND Ala]; Johnson v City of Fort Lauderdale, 903 F Supp 1520, 1523 [SD Fla]; with Federation of African-Am. Contrs. v City of Oakland, 96 F.3d 1204 [9th Cir]; Robinson v Town of Colonie, 878 F Supp 387, 405, n 13 [ND NY]; La Compania Ocho v United States Forest Serv., 874 F Supp 1242, 1251 [D NM]). We think the likeliest explanation for the amendment is the one adopted without discussion by the Court of Appeals in Dennis (55 F3d, at 156, n 1, supra): that the amendment was intended to codify the rule in Runyon v McCrary (supra).
Accordingly, Claims 1-5, based on 42 USC § 1981, were properly dismissed.

B
New York has no enabling statute similar to those contained in the Federal civil rights statutes permitting damage actions for the deprivation of constitutional rights. Thus, if we are to recognize a damage remedy it must be implied from the Constitution itself. The analysis is similar to that used by the Supreme Court when it recognized causes of action based on the Federal Constitution in Bivens (supra [search and seizure]) and Davis v Passman (442 US 228 [equal protection]).
A civil damage remedy cannot be implied for a violation of the State constitutional provision unless the provision is self-executing, that is, it takes effect immediately, without the necessity for supplementary or enabling legislation (see generally, Friesen, State Constitutional Law ¶ 7.05 [1], quoting from Cooley, Constitutional Limitations [7th ed]; 16 CJS, Constitutional Law, § 46). In New York, constitutional provisions are presumptively self-executing (see, People v Carroll, 3 N.Y.2d 686, 691).
Manifestly, article I, § 12 of the State Constitution and that part of section 11 relating to equal protection are self-executing. They define judicially enforceable rights and provide citizens with a basis for judicial relief against the State if those rights are violated. Actions of State or local officials which violate these constitutional guarantees are void (see, e.g., Foss v City of Rochester, 65 N.Y.2d 247 [equal protection]; People v Griminger, 71 N.Y.2d 635 [search and seizure]).
The violation of a self-executing provision in the Constitution will not always support a claim for damages, however (see, Shields v Gerhart, 163 Vt 219, 658 A2d 924; Figueroa v State of Hawaii, 61 Haw 369, 604 P2d 1198; and see generally, Friesen, *187 op. cit., ¶ 7.05). The substantive right may be firmly established, as in the case of sections 11 and 12, but it remains to determine whether the remedy of damages for the invasion of those rights will be recognized.

C
The State courts that have implied damage causes of action have traditionally rested their decisions on (1) the reasoning contained in the Restatement (Second) of Torts § 874A, (2) analogy to a Bivens action, (3) common-law antecedents of the constitutional provision at issue, or a combination of all three (see generally, Friesen, op. cit.; Baker, The Minnesota Constitution as a Sword: The Evolving Private Cause of Action, 20 Wm Mitchell L Rev 313; Bandes, Reinventing Bivens: The Self-Executing Constitution, 68 S Cal L Rev 289).
Section 874A of the Restatement (Second) of Torts states that a court may imply a civil remedy from legislative or constitutional provisions, even though one is not expressly provided, if it determines that the remedy is appropriate in furtherance of the purpose of the provision and needed to assure its effectiveness (see, Restatement (Second) of Torts § 874A; see also, comment d; People v Carroll, supra, at 690-691).
Some courts have relied on the reasoning of Bivens (403 US 388, supra). In Bivens, the Supreme Court implied a cause of action for damages against Federal officials who violated the search and seizure provisions of the Fourth Amendment. The underlying rationale for the decision, in simplest terms, is that constitutional guarantees are worthy of protection on their own terms without being linked to some common-law or statutory tort, and that the courts have the obligation to enforce these rights by ensuring that each individual receives an adequate remedy for violation of a constitutional duty. If the remedy is not forthcoming from the political branches of government, then the courts must provide it by recognizing a damage remedy against the violators much the same as the courts earlier recognized and developed equitable remedies to enjoin unconstitutional actions. Implicit in this reasoning is the premise that the Constitution is a source of positive law, not merely a set of limitations on government.
The Bivens analysis illustrates the Restatement principle. Although its use in the Federal courts has been narrowed somewhat by the Supreme Court (see, Federal Deposit Ins. Corp. v Meyer, 510 US 471; Schweiker v Chilicky, 487 US 412; United States v Stanley, 483 US 669; *188 see generally, Bandes, Reinventing Bivens: The Self-Executing Constitution, op. cit.), it is well recognized and has been applied to support a number of State decisions (see, e.g., Widgeon v Eastern Shore Hosp. Ctr., 300 Md 520, 479 A2d 921, supra; Gay Law Students Assn. v Pacific Tel. & Tel. Co., 24 Cal 3d 458, 595 P2d 592, supra; Phillips v Youth Dev. Program, 390 Mass 652, 459 NE2d 453, supra; Newell v City of Elgin, 34 Ill App 3d 719, 340 NE2d 344, supra; and see generally, Friesen, op. cit., ¶ 7.05 [2]; ¶ 7.07 [1]).
Finally, the courts have looked to the common-law antecedents of the constitutional provision to discover whether a damage remedy may be implied. New York's first Constitution in 1777 recognized and adopted the existing common law of England and each succeeding Constitution has continued that practice. Thus, in some cases, there exist grounds for implying a damage remedy based upon preexisting common-law duties and rights.

IV
Using these analytical tools, we conclude that a cause of action to recover damages may be asserted against the State for violation of the Equal Protection and Search and Seizure Clauses of the State Constitution.
The rights embodied in sections 11 and 12 were first constitutionalized when our present Constitution was adopted in 1938 but the principles expressed in those sections were hardly new. The Equal Protection Clause of the Fourteenth Amendment had been thoroughly debated and adopted by Congress and ratified by our Legislature after the Civil War, and the concepts underlying it are older still. Indeed, cases may be found in which this Court identified a prohibition against discrimination in the Due Process Clauses of earlier State Constitutions, clauses with antecedents traced to colonial times (see, e.g., People v King, 110 N.Y. 418; Charter of Liberties and Privileges, 1683, § 15, reprinted in 1 Lincoln, Constitutional History of New York, at 101).
The prohibition against unlawful searches and seizures originated in the Magna Carta and has been a part of our statutory law since 1828. The civil cause of action was fully developed in England and provided a damage remedy for the victims of unlawful searches at common law (see, Huckle v Money, 2 Wils 205, 95 Eng Rep 768 [1763]; Wilkes v Wood, Lofft 1, 98 Eng Rep 489 [1763]; Entick v Carrington, 19 State Tr 1029, [1558-1774] All ER Rep 41 [1765]).
*189 Thus, there is historical support for the claimants' contention that the rights guaranteed by these two provisions have common-law antecedents warranting a tort remedy for invasion of the rights they recognize. Indeed, the availability of a civil suit for damages sustained as the result of a constitutional violation was contemplated by the delegates to the Constitutional Convention of 1938. They did not consider whether one was desirable  they assumed a civil remedy already existed. At least that is so with respect to section 12. The debates over the proposed exclusion of evidence unlawfully obtained in criminal proceedings make that abundantly clear.[7]
Prior to the Convention of 1938, Judge Cardozo had written an opinion for the Court of Appeals holding that evidence obtained in violation of the search and seizure clause of the Civil Rights Act could be used against the defendant in a criminal trial. The defendant's remedy for the wrong, he said, was a civil suit for damages (see, People v Defore, 242 N.Y. 13, 19, cert denied 270 US 657). Based upon Cardozo's statement, the Convention delegates assumed that damages were available to the victim of unconstitutional action and they used that argument to help persuade the Convention that exclusion was unnecessary to deter official misconduct (see, 1 Rev Record of NY Constitutional Convention, 1938, at 416, 425, 459). These debates reveal that the concept of damages for constitutional violations was neither foreign to the delegates nor rejected by them. That the Convention adopted the equal protection provision without similarly discussing the damage remedy does not establish that the delegates disfavored it nor does it foreclose our consideration of that relief.
Moreover, implying a damage remedy here is consistent with the purposes underlying the duties imposed by these provisions and is necessary and appropriate to ensure the full realization of the rights they state (see, Bivens, supra, at 406 [Harlan, J., concurring]; see also, Cort v Ash, 422 US 66, 78; Restatement [Second] of Torts § 874A, comment d). The analysis is not unlike that which the Supreme Court and this Court have used to find a private right of action based upon certain regulatory statutes and is consistent with the rule formulated by the Restatement (see, e.g., Merrill Lynch, Pierce, Fenner & Smith v Curran, 456 US 353, 374-377; Cannon v University of Chicago, 441 US 677, 717; *190 Chotapeg, Inc. v Bullowa, 291 N.Y. 70, 73-74; Abounader v Strohmeyer & Arpe Co., 243 N.Y. 458; cf., CPC Intl. v McKesson Corp., 70 N.Y.2d 268; see generally, Restatement [Second] Torts § 874A; see generally, Burnham, op. cit.; and see, Wells and Eaton, op. cit.).
The provisions clearly define duties and impose them on government officers and employees. Section 11 is divided into two parts.[8] The first sentence directs that "[n]o person shall be denied the equal protection of the laws of this state or any subdivision thereof." The provision was intended to afford coverage as broad as that provided by the Fourteenth Amendment to the United States Constitution (see, Dorsey v Stuyvesant Town Corp., 299 N.Y. 512, 530; 2 Rev Record of NY State Constitutional Convention, 1938, at 1065). The section imposes a clear duty on the State and its subdivisions to ensure that all persons in the same circumstances receive the same treatment (see, Davis v Passman, supra [implying a Federal cause of action based on the Fifth Amendment for denial of equal protection]).
The remainder of section 11 prohibits discrimination. It is implicit in the language of the provision, and clear from a reading of the constitutional debates, that this part of the section was not intended to create a duty without enabling legislation but only to state a general principle recognizing other provisions in the Constitution, the existing Civil Rights Law or statutes to be later enacted (see, Dorsey v Stuyvesant Town Corp., supra, at 531; 2 Rev Record of NY Constitutional Convention, 1938, at 1069, 1144; id., vol 4, at 2626-2627). The Legislature subsequently implemented those guarantees by provisions of various statutes which regulate the conduct of both State officers and private individuals (see, e.g., Executive Law § 290 et seq. [Human Rights Law]; Civil Rights Law § 40 et seq.; Labor Law § 220-e).
*191 The language of section 12 imposes a duty regulating the conduct of police officials.[9] It is consistent with the search and seizure provisions found in the Federal Constitution and the Constitutions of other States. Though a similar provision is found in the earlier enacted section 8 of the Civil Rights Law, the constitutional section is self-executing.
These sections establish a duty sufficient to support causes of action to secure the liberty interests guaranteed to individuals by the State Constitution independent of any common-law tort rule. Claimants alleged that the defendant's officers and employees deprived them of the right to be free from unlawful police conduct violating the Search and Seizure Clause and that they were treated discriminatorily in violation of the State Equal Protection Clause. The harm they assert was visited on them was well within the contemplation of the framers when these provisions were enacted for fewer matters have caused greater concern throughout history than intrusions on personal liberty arising from the abuse of police power. Manifestly, these sections were designed to prevent such abuses and protect those in claimants' position. A damage remedy in favor of those harmed by police abuses is appropriate and in furtherance of the purpose underlying the sections.
Nor should claimants' right to recover damages be dependent upon the availability of a common-law tort cause of action. Common-law tort rules are heavily influenced by overriding concerns of adjusting losses and allocating risks, matters that have little relevance when constitutional rights are at stake. Moreover, the duties imposed upon government officers by these provisions address something far more serious than the private wrongs regulated by the common law. To confine claimants to tort causes of action would produce the paradox that individuals, guilty or innocent, wrongly arrested or detained may seek a monetary recovery because the complaint fits within the framework of a common-law tort, whereas these claimants, who suffered similar indignities, must go remediless because the duty violated was spelled out in the State Constitution.
*192 Damages are a necessary deterrent for such misconduct. The remedies now recognized, injunctive or declaratory relief, all fall short. Claimants are not charged with any crime as a result of their detention and thus exclusion has no deterrent value. Claimants had no opportunity to obtain injunctive relief before the incidents described and no ground to support an order enjoining future wrongs. For those in claimants' position "it is damages or nothing" (see, Bivens, 403 US, at 410, supra [Harlan, J., concurring]). The damage remedy has been recognized historically as the appropriate remedy for the invasion of personal interests in liberty, indeed, damage remedies already exist for similar violations of the Federal Constitution. Those created by Congress and the Supreme Court, however, fail to reach State action though it is on the local level that most law enforcement functions are performed and the greatest danger of official misconduct exists. By recognizing a narrow remedy for violations of sections 11 and 12 of article I of the State Constitution, we provide appropriate protection against official misconduct at the State level.

V
A number of observations are in order about the dissent.
Judge Bellacosa cites several cases dealing with legal defenses which the State may interpose to avoid liability (see, e.g., Arteaga v State of New York, 72 N.Y.2d 212 [legislative or judicial immunity]; Tarter v State of New York, 68 N.Y.2d 511 [quasi-judicial or discretionary actions]; Weiss v Fote, 7 N.Y.2d 579 [same]; Miller v State of New York, 62 N.Y.2d 506, 510 [special duty]; Merced v City of New York, 75 N.Y.2d 798 [same]; Steitz v City of Beacon, 295 N.Y. 51 [same]; Sharapata v Town of Islip, 56 N.Y.2d 332 [immunity from punitive damages or "remedial immunity"]; see generally, Prosser and Keeton, Torts, at 1032 et seq. [5th ed]). These defenses, sometimes referred to loosely as "immunities", should not be confused with sovereign immunity. The immunity waived by section 8 of the Act is the historic immunity derived from the State's status as a sovereign and protects the State from suit. The defenses the dissent refers to are based on the special status of the defendant as a governmental entity. The State is amenable to suit but may nevertheless assert these grounds to avoid paying damages for some tortious conduct because, as a matter of policy, the courts have foreclosed liability (see, Arteaga v State, supra; Weiss v Fote, supra). The cited cases have little to do with the jurisdictional issue before us and, notably, in each of *193 them the Court entertained jurisdiction and decided the matter on the basis of the defense asserted.
Addressing a related concept, the dissent has equated immunity with the special duty rule. The special duty rule holds that a plaintiff cannot recover against a municipality for failure to supply police protection or similar services absent a special relationship between the plaintiff and the police or municipality (citing Merced v City of New York, 75 N.Y.2d 798, supra; Steitz v City of Beacon, 295 N.Y. 51, supra). The duty to supply police protection or similar services is a duty owed to the public at large and, as such, violation of those duties does not create civil liability absent some special relationship or undertaking by the government in favor of the plaintiff (compare, Merced v City of New York, supra, with De Long v County of Erie, 60 N.Y.2d 296). The duties imposed by the Constitution, which are at issue here, secure rights and privileges to individuals, as individuals. A breach of those duties is actionable under existing law. The question before us is whether a civil action for damages may be based upon the duties imposed by sections 11 and 12 of article I of the State Constitution.
The dissent also criticizes the majority for creating new respondeat superior liability against the State. It asserts this action is contrary to the holding of the Supreme Court in Monell (dissenting opn, at 205). It is the statute that imposes vicarious liability on the State, however, not this Court (see, Court of Claims Act § 9 [2]). Our decisions have uniformly recognized this fact (see, Jackson v State of New York, 261 N.Y. 134, supra; Liubowsky v State of New York, 260 App Div 416, affd 285 N.Y. 701; Robison v State of New York, 263 App Div 240, later appeal 266 App Div 1054, affd 292 N.Y. 631).
The authorities cited in the dissent for the proposition that the State may not be liable vicariously simply do not support any such rule. Indeed, in Becker v City of New York (2 N.Y.2d 226 [holding that the waiver of immunity contained in the Court of Claims Act applies not only to the State but also to its subdivisions under the rule in Bernardine v City of New York, 294 N.Y. 361]), we held the State had waived its immunity from respondeat superior liability and specifically recognized that the State and its subdivisions were liable for the acts of their employees (id., at 236). Accordingly, we reversed a judgment in favor of the City which had held otherwise and sent the case back for a new trial. In Welch v State of New York (203 AD2d 80) the Appellate Division held, as we do here, that the State *194 cannot be liable on the basis of respondeat superior in a section 1983 action under the rule in Monell v New York City Dept. of Social Servs. (436 US 658, supra). A section 1983 action is controlled by the Federal statute which limits liability to actions taken "under color" of State law, i.e., as a matter of governmental policy or custom (see, Monell, supra, at 691-692). A plaintiff seeking to recover on the basis of respondeat superior simply does not come within the terms of section 1983. The Welch decision, based as it is on the Federal enabling statute, is inapposite to the action here based on the State Constitution and governed by the State statutes waiving immunity and imposing respondeat superior liability for actions of officers and employees.
Nor is there any reason why the State should not be vicariously liable for constitutional torts by its officers or employees acting in the course of their employment. The State is answerable for the conduct of its officers who commit common-law torts, such as assault and false imprisonment, even if they are joined with constitutional torts and there is no reason why, if constitutional torts are actionable, the State should not be similarly liable in the absence of a common-law tort. Indeed, whether the delegates to the Constitutional Convention contemplated liability of the State or of individuals for violating a constitutional duty  and the dissent acknowledges that individuals may be liable (see, e.g., dissenting opn, at 208)  is irrelevant. If individuals may be liable, then the State is liable because the Legislature, by enacting sections 8 and 9 (2) of the Court of Claims Act, has determined that the State is answerable for the wrongs of its officers and employees.
The dissent maintains that there is little deterrent value in holding the State responsible for the torts of its officers and employees: the individual wrongdoer should pay, it says, not the State. Preliminarily, it should be noted that claimants assert liability against the State based upon inadequate training and supervision by the State as well as liability based on the individual officers' conduct. Moreover, in many cases the State will be secondarily liable for the employees' acts because it has assumed the obligation to defend and indemnify them (see, Public Officers Law § 17).
But aside from those considerations, the State is appropriately held answerable for the acts of its officers and employees because it can avoid such misconduct by adequate training and supervision and avoid its repetition by discharging or disciplining negligent or incompetent employees. Moreover, there is no *195 reason why the deterrent value of holding the State answerable for an actionable assault by one of its employees is warranted but the deterrent value of holding it liable for an employee's constitutional tort is not. Thus, contrary to the reasoning of Federal Deposit Ins. Corp. v Meyer (510 US 471, supra) and Bivens (403 US 388, supra), that liability should be confined to the individual wrongdoer, there is merit to imposing liability on the party who is ultimately responsible  and who the wrongdoer will often blame for ordering or directing the conduct complained of, the State.
Bivens and Federal Deposit Ins. Corp. must be seen in context. The Federal Government was not sued in Bivens because it was immune from suit (see, Bivens, supra, at 410 [Harlan, J., concurring]; see also, Bandes, op. cit., at 342). In Federal Deposit Ins. Corp. v Meyer (510 US 471, supra), the injured party tried to hold an agency of the Federal Government liable because the individual defendant enjoyed immunity from liability in a Bivens action. There is no similar problem here because the State has waived immunity for the acts of its officers and employees (see, Court of Claims Act § 9 [2]) and this provision distinguishes the case before us from the Federal cases limiting liability to individuals.
It should be noted that Congress could not, in view of the Eleventh Amendment of the United States Constitution, overrule a State's claimed sovereign immunity from suit in Federal or State courts (see, Pennhurst State School & Hosp. v Halderman, 465 US 89, 98-99; Quern v Jordan, 440 US 332, 342). The dissent, relying on the restraint sometimes evident in Supreme Court decisions involving constitutional torts, fails to recognize that these concerns of federalism underlie much of the Supreme Court's reluctance to expand the relief available under section 1983 and thereby unduly interfere with States' rights. On this point, Professor Shapo, partially quoted in the dissent (at 204-205), stated that the "federal judiciary should tread warily in utilizing a civil damage remedy against local law enforcement officers" (see, Shapo, Constitutional Tort: Monroe v. Pape, and the Frontiers Beyond, 60 Nw U L Rev 277, 325 [emphasis added]). In Paul v Davis (424 US 693), the Supreme Court, concerned about the reach of the Due Process Clause in section 1983 actions, declined to use the Fourteenth Amendment to create "a font of [Federal] tort law" and impose it on the States (id., at 701; see also, Whitman, Constitutional Torts, op. cit., at 10). The Court did, however, acknowledge that actions could be based upon the specific constitutional guarantee *196 against unreasonable searches and seizures (id., at 700-701). We recognize here a similar cause of action based on our State Constitution.
The dissent expresses the concern that recognition of a damage remedy here will result in the courts being deluged with lawsuits and seriously jeopardize the public treasury. Our decision does not hold that every tort by a government employee is actionable, or that those which may be will be actionable under all circumstances. Claimants must still establish that their constitutional rights have been violated and that a damage remedy is available to them. Perhaps the most effective answer to the dissent's contention, however, was expressed by Justice Harlan in his concurring opinion in Bivens:
"Judicial resources, I am well aware, are increasingly scarce these days. Nonetheless, when we automatically close the courthouse door solely on this basis, we implicitly express a value judgment on the comparative importance of classes of legally protected interests. And current limitations upon the effective functioning of the courts arising from budgetary inadequacies should not be permitted to stand in the way of the recognition of otherwise sound constitutional principles" (403 US, at 411).
The point is that no government can sustain itself, much less flourish, unless it affirms and reinforces the fundamental values that define it by placing the moral and coercive powers of the State behind those values. When the law immunizes official violations of substantive rules because the cost or bother of doing otherwise is too great, thereby leaving victims without any realistic remedy, the integrity of the rules and their underlying public values are called into serious question. A damage remedy for constitutional torts depriving individuals of their liberty interests is the most effective means of deterring police misconduct, it is appropriate to the wrong and it is consistent with the measure by which personal injuries have historically been regulated.
Finally, it should be noted that sovereign immunity  although originally a common-law doctrine defined solely by the courts  is now a creature of statute. Thus, it is within the power of the Legislature to redefine the jurisdiction of the Court of Claims if it sees fit to do so.
Accordingly, Claims 7 and 8, insofar as they state causes of action based upon sections 11 and 12 of article I of the State Constitution, are sustained.

*197 VI

The Remaining Causes of Action
Claimants have discontinued Claim 6 alleging a conspiracy and Claim 10 alleging a violation of Public Officers Law article 6-A. Additionally, we need not address the sufficiency of Claim 9, asserting a cause of action based on section 40-c of the Civil Rights Law, because claimants acknowledge in their brief that damages are not available to them from the State on that cause of action.[10] The claim under section 8 of the Civil Rights Law is duplicative of the constitutional claim based on section 12 of article I of the Constitution and should be dismissed for that reason. Finally, the Court of Claims has jurisdiction over Claim 11, asserting a cause of action for negligent training and supervision.
In sum, the Court of Claims has jurisdiction of all the causes of action asserted in this claim. Claims 7 and 8 insofar as they allege claims based upon violations of article I, §§ 11 and 12 of the New York State Constitution and Claim 11 alleging a claim for negligent training and supervision are facially sufficient to state causes of action against defendants and should be reinstated. The remaining causes of action were properly dismissed.
Accordingly, the order of the Appellate Division should be modified, without costs, and the case remitted to the Court of Claims for further proceedings in accordance with this opinion and, as modified, affirmed.
BELLACOSA, J. (dissenting).
Because the dismissal of this entire case against the State by the Court of Claims and the Appellate Division is the justifiable result, I respectfully dissent. The synopsis for my vote to affirm is:
 The New York Constitution grants the Legislature the responsibility to define the subject-matter jurisdiction of the Court of Claims;
 Duly considered and enacted statutes expressly prescribe *198 and implement that power and forbid implied State liability;
 The judicial inferential interpretive method is neither supportable nor suitable for the resolution of this preanswer dispute, in which the Court of Appeals promulgates new subject-matter jurisdiction for a court of limited powers and recognizes new remedies and causes of action against the State;
 The constitutional tort theory and nomenclature should not be equated and subsumed within conventional tort doctrines, as a route to resolving fundamental subject-matter jurisdiction and sovereign immunity issues, affecting New York's jurisprudence in and for the Court of Claims.
The following reasoning and documentation of authorities is necessary because of the complex nature of this dispute and the extensive majority explication. The reinstatement of constitutional tort claims in the Court of Claims invests that court with inferred subject-matter jurisdiction, which the Legislature has not seen fit to confer expressly. The means used to find an implied legislative authorization to achieve the end result substitutes for a quintessentially legislative prerogative.
This Court, "[b]y recognizing" what it tries to minimize as a "narrow remedy for violations of sections 11 and 12 of article I of the State Constitution" so as to "provide appropriate protection" under a distinct "`species of tort liability'" (majority opn, at 178, 192), requires the State itself to answer for alleged "official" wrongdoings. The exposure includes the stigma of societal fault and the payment of unknown sums of public funds, not only for this case but also for innumerable others certain to be improvised within its precedential repertoire.
The significant and sharp controversy grows out of a race-based, communitywide police sweep, as part of an investigation stemming from a serious crime committed in an upstate college town. As Judge Hanifin stated, however, in his comprehensive and cogent trial court opinion: "This Court [of Claims] cannot expand its jurisdiction based on the emotional content of the issues presented to it" (Brown v State of New York, Ct Cl, Mar. 17, 1994, claim No. 86979, affd 221 AD2d 681). The *199 focus in this Court, too, should remain solely on the statutory construction question posed by this case: whether the State itself may be sued in the New York State Court of Claims for affronts classified as "constitutional torts."
I conclude that the analysis and result that ultimately tap the deep reservoir of State responsibility are fundamentally flawed as a matter of law and history. No sustainable root and nexus have been sufficiently identified to overcome the twin towers of State protection expressly reflected in the statutorily specified subject-matter jurisdiction of the Court of Claims and limited surrender of sovereign immunity. Instead, a wide web of words within the statutory interpretation method has been used to discern a route to the desired result, while traditional respect for and proper distribution of power between legislative and judicial branches are deflected. On the other hand, though I express a dissenting viewpoint, I also recognize and respect the cogency and reasonableness that is reflected in the decision my colleagues reach in this complicated case.

I. JURISDICTION AND SOVEREIGN IMMUNITY

A.
The first general statutory provision for claims against the State related to the operation of the Erie Canal (L 1817, ch 262). Through many statutory permutations, the modern Court of Claims was constituted in 1915 (L 1915, chs 1, 100). Its essential jurisdiction prescribed that "[i]n no case shall any liability be implied against the state, and no award shall be made on any claim against the state except upon such legal evidence as would establish liability against an individual or corporation in a court of law or equity" (Code Civ Pro § 264 [emphasis added]).
In Smith v State of New York (227 N.Y. 405), this Court held that the State had not waived its sovereign immunity except as expressly surrendered and, thus, preserved the unrelinquished sovereign immunity of the State (id., at 409-410). The operative construction canon is that "[s]tatutes in derogation of the sovereignty of a state must be strictly construed and a waiver of immunity from liability must be clearly expressed. * * * In the absence of a legislative enactment specifically waiving this immunity, the state cannot be subjected to a liability therefor" (Smith v State, supra, at 410 [emphasis added]). The majority now ordains a new canon, using a judicial inference method not to fill a natural or legislative interstice, *200 but to discover a vaguely unexplored universe of extensive tort exposure against the State, triable in a court of limited jurisdiction.

B.
The history of the exclusive legislative authority with respect to the investiture of jurisdiction in the Court of Claims is plainly expressed in New York Constitution, article VI, § 9 (originally added in 1925 as art VI, § 23). It states that "[t]he court shall have jurisdiction to hear and determine claims against the state or by the state against the claimant or between conflicting claimants as the legislature may provide" (NY Const, art VI, § 9 [emphasis added]; see, Court of Claims Act § 9).
Court of Claims Act § 9 (2) precisely lists the subject-matter jurisdiction in words and structure that indicate a careful consideration by the Legislature of the categories and circumscriptions of claims to which the State's waiver of immunity would also apply. This Court, interpreting the State's statutory post-Smith waiver of immunity (L 1929, ch 467), noted that "[i]t includes only claims which appear to the judicial mind and conscience to be such as the Legislature may declare * * * the State should satisfy" (Jackson v State of New York, 261 N.Y. 134, 138, rearg denied 261 N.Y. 637 [emphasis added]). The legislative history accompanying recodification of the Court of Claims Act shows no intention, understanding or contemplation to sweep the State's assumption of liability into uncharted and open waters as are at issue in this case (see, Bill Jacket, L 1939, ch 860, Mem of James Barrett, Presiding Judge of the Ct Cl, at 2; Mem of Senator Feinberg, at 2-3).
Section 9 of the Court of Claims Act provides, "[t]he court shall have jurisdiction * * * 2. To hear and determine a claim of any person, corporation or municipality against the state * * * for the torts of its officers or employees while acting as such officers or employees, providing the claimant complies with the limitations of this article" (id. [emphasis added]). Correspondingly, the State's waiver of sovereign immunity is contained in section 8 of the Act, which provides: "The state hereby waives its immunity from liability and action and hereby assumes liability and consents to have the same determined in accordance with the same rules of law as applied to actions in the supreme court against individuals or corporations" (Court of Claims Act § 8 [emphasis added]). It is the interplay and application of the various constitutional and *201 legislative declarations, with their evident and express limitations that ought to govern this controversy, not speculative attributions of implied and assumed legislative intent.
The plaintiffs' predicate argument is that the Legislature, through its use of the word "torts," implied an all-encompassing corral of wrongs. For starters and contrary to this theory, traditional tort law is not an undefinable, limitless arena of wrongs. Rather, the word of art reflects "[t]he civil action for a tort * * * is commenced and maintained by the injured person, and its primary purpose is to compensate for the damage suffered, at the expense of the wrongdoer" (Prosser and Keeton, Torts § 2, at 7 [5th ed]). Professor Prosser also notes the realistic and sensible limitation that "[i]t does not lie within the power of any judicial system to remedy all human wrongs" (Prosser, op. cit., § 4, at 23). Indeed, the word "tort," for subject-matter jurisdictional purposes, should be viewed and determined discretely within that universe and context.
A core feature of the defendant State's more nuanced argument, moreover, is not that the word "tort" is frozen like a fossil in time as of the original enactment of Court of Claims' jurisdiction. That is a strawman argument posed to overcome the cogent State position on virtually all points and authorities. Indeed, the focus in this statutory construction exercise should remain fixed on the proposition that the term "tort," for these jurisdictional purposes, pertains only to those claims reasonably understood by the enactors, as part of the common-law tradition, developed within the tort root rubric and jurisprudence (see, e.g., Bovsun v Sanperi, 61 N.Y.2d 219; Battalla v State of New York, 24 N.Y.2d 980, affg 26 AD2d 203). The State's argument should prevail by a reasonable interpretation of the governing statute, the history of its enactment, and this Court's restrained interpretation of it and its own powers in this regard. A transformative redefinition and expansion into a fundamentally different juridical genre gives the holding of the instant case breadth-taking dimensions. Moreover, that approach ignores the well-established discipline that subject-matter jurisdiction, groundbreaking new remedies and their policy and practical ramifications, are matters appropriately within the legislative purview and, thus, not within some generalized supervisory or inferential adjudicative role of the courts (see generally, Gershman, Supervisory Power of the New York Courts, 14 Pace L Rev 41 [1994]).
This Court, following the general canon that any waiver of immunity by the State is to be narrowly construed, has further *202 noted that the waiver of immunity (8) and grant of jurisdiction (9) are not absolute and open-ended (Weiss v Fote, 7 N.Y.2d 579, 585-587). Relevant and analogous precedents illustratively point out that the "State waived that immunity which it had enjoyed solely by reason of its sovereign character," but that "the State retained its immunity for those governmental actions requiring expert judgment or the exercise of discretion" (Arteaga v State of New York, 72 N.Y.2d 212, 215-216; see, Tarter v State of New York, 68 N.Y.2d 511, 518-519).
Significantly, in Sharapata v Town of Islip (56 N.Y.2d 332), this Court emphasized that it "is hard to believe that any attempt to include punitive damages [in Court of Claims Act § 8] would not have induced lively legislative debate, contemporary State history preceding the formulation of section 8 gives no indication that the matter ever evoked any legislative interest" (id., at 337 [emphasis added]). The Court stated that:
"[T]he twin justifications for punitive damages  punishment and deterrence  are hardly advanced when applied to a governmental unit. As [then] Justice TITONE realistically put it in his opinion below, it would be anomalous to have `the persons who bear the burden of punishment, i.e., the taxpayers and citizens,' constitute `the self-same group who are expected to benefit from the public example which the granting of such damages supposedly makes of the wrongdoer'" (Sharapata v Town of Islip, supra, 56 NY2d, at 338-339, affg 82 AD2d 350).
The holding of the instant case disregards the usefulness garnered from the parallel purposes and pertinent guidance reflected in the analysis of the punitive damages issue in respect to the constitutional tort "species" (majority opn, at 178, 192).
In Steitz v City of Beacon (295 N.Y. 51), this Court, in interpreting the application of Court of Claims Act § 8 to municipalities, noted that "[a]n intention to impose upon the city the crushing burden of such [liability] should not be imputed to the Legislature in the absence of language clearly designed to have that effect" (id., at 55 [emphasis added]). Yet, that is precisely what the stretched and attenuated analysis does in the instant case (see, Weiss v Fote, 7 N.Y.2d 579, 586-587, supra). It is, after all, the unique governmental police power that is involved here, not some ordinary form of individual or *203 corporate tortious act. For that reason, among others, the claims asserted in this case are nowhere near "sufficiently similar" (majority opn, at 183) to traditionally recognized individual or corporate tort conduct, the limiting and qualifying phrase of the statute itself.
The refined interpretation previously accorded to the State's waiver of immunity is also reflected in the handling of torts involving members of the State militia. In Goldstein v State of New York (281 N.Y. 396), the Court noted that "if the word `officers' is given its broad meaning it would include every officer engaged in performing a duty placed upon him by law, including the Governor, judges, members of the Legislature and all others occupying an official position in the State. Such an interpretation of the statute would lead to an absurd conclusion" (id., at 405 [emphasis added]). The claim was dismissed because the State militia were not within the meaning of the State's waiver of sovereign immunity (id., at 406; see also, Newiadony v State of New York, 276 App Div 59). In 1953, the Legislature amended the Court of Claims Act (L 1953, ch 343) adding section 8-a by which the State waived its immunity for such torts. Notably, the Legislature  not the courts  expressly expanded this jurisdictional reach into that category, as it also did after Smith (see, Jackson v State of New York, 261 N.Y. 134, 138, supra). The Legislature does not leave these substantial definitional duties and demarcations to chance, implication, the fertile inferential method or to other entities, because definiteness and distribution of powers are important societal and jurisprudential values. It knows well how to be very plain about such matters in fulfilling its up-to-now distinctive responsibility.
The Legislature has never contemplated the common-law word "tort" to include the kind of extensive constitutional domain advanced here because, not only did it not exist until recently, but also had the notion occurred or been presented to that legislative body, the policy debates would surely and necessarily have been "lively" indeed (Sharapata v Town of Islip, 56 N.Y.2d 332, 337, supra). When the Legislature enacted section 12 (1) of the Court of Claims Act  "In no case shall any liability be implied against the state" (emphasis added)  it could not have contemplated this kind of substantial judicial exertion, promulgating new substantive remedies.

*204 II. CONSTITUTIONAL TORTS

A.
The coined term "constitutional tort" is used generally to refer to civil damage actions initiated under 42 USC § 1983. In Monroe v Pape (365 US 167), claimants whose Federal rights were infringed by acts of police officers were allowed to sue individual officers. They could not sue the municipal employer because Congress did not intend municipalities to be "persons" under 42 USC § 1983 (id., at 187, 191). (I agree, by the way, that the 42 USC § 1981 claims remain properly dismissed, but for the more fundamental reason of lack of subject-matter jurisdiction.) The Court in Monroe never expressly or impliedly recognized new species of claims embraced in the classification or common-law history of tort, especially for purposes like local subject-matter jurisdiction.
The origin of the sobriquet "constitutional tort," which so overridingly drives the analysis of the instant case, is found in the title of a law review article that sets forth to "analyze the jurisprudential development of a federal statutory remedy" (Shapo, Constitutional Tort: Monroe v. Pape, and the Frontiers Beyond, 60 Nw U L Rev 277, 323-324 [1965] [emphasis added]; see, Burnham, Separating Constitutional and Common-Law Torts: A Critique and a Proposed Constitutional Theory of Duty, 73 Minn L Rev 515, n 2 [1989]). Substance and the essence of the claims ought to control, however, not catchy nomenclature for law review titles, later conveniently utilized as semantical shorthand. Chief Judge Fuld, in Morrison v National Broadcasting Co. (19 N.Y.2d 453, revg 24 AD2d 284), in a related context, quoting a well-established rubric, stated: "`We look for the reality, and the essence of the action and not its mere name'" (id., at 459, quoting Brick v Cohn-Hall-Marx Co., 276 N.Y. 259, 264).
The proposition that "constitutional torts" are equivalent to or derive their essential nature from any common-law tort antecedent, worthy of present-day Court of Claims cognizance without legislative authorization, finds no support anywhere. Quite the contrary, in describing a "constitutional tort," Professor Shapo states "[i]t is not quite a private tort, yet contains tort elements; it is not `constitutional law,' but employs a constitutional test. Because of this interesting amalgam, serious questions arise about the measurement of the substantive right" (Shapo, op. cit., at 324). Indeed, the wordsmith himself warns that the "judiciary should tread warily in utilizing a *205 civil damage remedy against local law enforcement officers [I now add a fortiori, against the State itself], where much that is vital to the case grows uniquely from the local situation" (Shapo, op. cit., at 325). Serious confusion is sown from intermingling distinct doctrinal sources, as is evident in the spiral of this case, which has no Federal statutory source and no equivalent or corresponding State statutory enabling predicate.
In Monell v New York City Dept. of Social Servs. (436 US 658), when the Supreme Court overruled Monroe and declared that municipalities could be liable under 42 USC § 1983, it added that "a municipality cannot be held liable solely because it employs a tortfeasor  or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory" (Monell v New York City Dept. of Social Servs., supra, at 691 [emphasis added]). This key analytical link is rejected by the majority.
Finding accountability for the first time within this uniquely governmental police power context, against the express admonitions of Monell and by the classification of such acts as within this State's surrender of sovereign immunity, fails to credit and respect this important historical and precedential limitation. Ironically, now the effect of the State's limited waiver of liability in Court of Claims Act § 8 makes "the State and its subdivisions liable, under the doctrine of respondeat superior, for the negligent acts of its paid employees" in pure constitutional police power circumstances, never contemplated, debated or legislatively enacted (Becker v City of New York, 2 N.Y.2d 226, 235; see also, Welch v State of New York, 203 AD2d 80, 81). Since that is not what the State statutorily surrendered, the upending of this key limitation by something interpretively elevated and recognized as constitutional tort actions against the State and swept into the Court of Claims' limited charter is severely unsettling (see, Prosser, op. cit., § 69, at 500).
This Court has emphasized, "`[t]he municipal corporation is different. It is not organized for any purpose of gain or profit, but it is a legal creation engaged in carrying on government and administering its details for the general good and as a matter of public necessity'" (Sharapata v Town of Islip, 56 N.Y.2d 332, 337, supra, quoting Costich v City of Rochester, 68 App Div 623, 631). Under the majority's holding, the State may well be deprived of traditional defenses, although those would be available to a government defendant in a Federal constitutional *206 rights-statutory source case (see, Collins v Harker Hgts., 503 US 115, 121-122; Monell v New York City Dept. of Social Servs., 436 US 658, 691, supra). Indeed, most of the rules limiting tort responsibility  to which the State's waiver of sovereign immunity and immunity-like protections would otherwise apply  are rendered inoperative and impotent when claims trace their origins to the superior ordinances of constitutional dimension, without any specific statutory enablement or qualifying features.
The United States Supreme Court itself  with apt instruction concerning the instant question  has noted differences between "constitutional torts" and common-law torts (see, Paul v Davis, 424 US 693, 701 [refused to make Due Process Clause "a font of tort law" and noted the "constitutional shoals" confronting any attempt to derive a body of tort law from Federal civil rights statutes (emphasis added)]; Carey v Piphus, 435 US 247, 258-259; Daniels v Williams, 474 US 327, 332; Farmer v Brennan, 511 US 825, 837-838). In analyzing constitutional tort violations the Supreme Court has "emphasize[d] the separate character of the inquiry into the question of municipal responsibility and the question whether a constitutional violation occurred" (Collins v Harker Hgts., 503 US 115, 122, supra). That some of these notions spring from federalism restraints is not my point; the flat refusal of the majority to heed home-grown constraints, well-established and tested within the historical development and this State's own constitutional, jurisprudential and statutory disciplines, is the point of my departure and puzzlement (majority opn, at 195).
Further, in "constitutional tort" exertions, claimants are not required to satisfy other thresholds limiting municipal liability, like the "special duty rule" applicable to "ordinary" common-law tort actions against governments. In this respect, this Court has held and cautioned that:
"Absent this requirement, a municipality would be exposed to liability every time one of its citizens was victimized by crime and the municipality failed to take appropriate action although notified of the incident  so vast an expansion of the duty of protection should not emanate from the judicial branch. `Before such extension of responsibilities should be dictated by the indirect imposition of tort liabilities, there should be a legislative determination that that should be the scope of public responsibility'" *207 (Kircher v City of Jamestown, 74 N.Y.2d 251, 259, quoting Riss v City of New York, 22 N.Y.2d 579, 582; see, Miller v State of New York, 62 N.Y.2d 506; Merced v City of New York, 75 N.Y.2d 798; see also, Schuster v City of New York, 5 N.Y.2d 75).
For these additional reasons, the Federal statutory "constitutional tort" concept should not be merged and subsumed within the meaning of "tort," as specifically delineated by Court of Claims Act § 8  unless other appropriate protections for the State are somehow balanced into the equation. This is not done, additionally fortifying the wisdom of keeping the nuanced weighing within the legislative ambit.
No intimation appears anywhere that the Legislature ever thought of, no less enabled or implemented, this new overflowing "font" of State tort liability (see, Paul v Davis, 424 US 693, 701, supra). To infer that it did fundamentally disregards differences of kind and essence, not just degree. The comprehensive treatment and redefinition of the word "tort" in New York for jurisdictional purposes transforms the distinctive and unique qualities, nature, source, purpose and history between conventional torts and constitutional torts.

B.
Plaintiffs are also successful in achieving a result that declares "constitutional torts" as within the class of claims to which the State has surrendered its immunity in the Court of Claims. This conclusion is seriously questionable, as this Court has never before conflated a constitutional duty into such a pervasive and comprehensive tort theory for damages, energized by sheer inference. Notably, claimants are not asking for or receiving some equivalent remedy existing and recognized elsewhere, as the prayer for relief is generously characterized (majority opn, at 179). This relief, as acknowledged throughout the majority opinion, is an additionally recognized remedy, despite forthright acknowledgments of express and analytical limitations. Moreover, it is a remedy in New York only and against the State of New York alone.
I do not doubt for a moment that the Court of Claims possesses jurisdiction over "constitutional tort" type claims when they share a recognized common-law lineage or specifically authorized root such as assault, false arrest, trespass, malicious prosecution and many more (Bovsun v Sanperi, 61 N.Y.2d 219, supra; Battalla v State of New York, 24 N.Y.2d 980, supra). Thus, "[b]y virtue of its waiver of [sovereign] immunity, the State of *208 New York has provided a means by which the citizen can obtain satisfaction in such cases and, at the same time, has afforded protection to itself from unjustified claims based on groundless accusations" (McNamara, Jr., The Court of Claims: Its Development and Present Role in the Unified Court System, 40 St John's L Rev 1, 40 [1965]).
In this respect, however, the reliance on People v Defore (242 N.Y. 13, cert denied 270 US 657) for the proposition that this Court in the early part of this century recognized a private damages action for search and seizure against the State is as curious in its application to this case as it is disturbing for its wider implications (see, Pitler, Independent State Search and Seizure Constitutionalism: The New York State Court of Appeals' Quest for Principled Decisionmaking, 62 Brook L Rev 1, seriatim, and at 13-14, 86-97, 152-185 [1996]). In Defore, this Court rejected suppression of illegally acquired evidence as an inappropriate remedy (People v Defore, supra, at 25, 28). Judge Cardozo commented that direct remedies were available to a person subjected to an illegal search, stating that "[t]he officer might have been resisted, or sued for damages, or even prosecuted for oppression" (id., at 19 [emphasis added]). The majority in the instant case treats Judge Cardozo's dictum about a private right of action as if it applied against the State  indeed such an assumption is also attributed to the 1938 Constitutional delegates. This mischaracterization is registered frequently in the majority opinion and is reflected in numerous citations that also do not support the enlarged proposition for which they are advanced.
The delegates to the 1938 Constitutional Convention, in considering proposals to adopt the Federal exclusionary rule, appreciated that the civil damages remedy, merely theoretically posed in Defore, was available only against the offending officer (see, Statement by Harold Riegelman, 1 Rev Record of NY Constitutional Convention, 1938, at 416 ["The State forbids an unreasonable search. The State officer disobeys the injunction. He can and should be punished and made to answer in damages" (emphasis added)]; see also, Pitler, op. cit., at 94). These authorities demonstrate that absolutely no basis whatsoever is presented for even a tenuous speculation that Judge Cardozo or the 1938 Constitutional delegates ever imagined a direct action against the State itself for money damages resulting solely from constitutional provisions deemed self-executing.
The same Constitutional Convention, relied upon now to infer a direct action damage remedy against the State, *209 expressly rejected  after sharp and lively debate  not only an exclusionary remedy, but also a forfeiture of office remedy (1 Rev Record of NY Constitutional Convention, 1938, at 578). These express rejections were not done because of the hypothetical dictum of Judge Cardozo concerning a personal civil action, but for fundamental, doctrinal and jurisprudential reasons that were fully debated (see, Statement of Harry E. Lewis, Chairman, Bill of Rights Comm, 1 Rev Record of NY Constitutional Convention, 1938, at 577-578 [opposed office forfeiture amendment to Search and Seizure Clause because it "is necessarily legislative"]). This history and specificity prove, it seems to me, that the civil remedy announced today was never on any delegate's or legislator's mind or list, nor should it be assumed to have been (see, Pitler, op. cit., at 157). The gap between express rejection of considered remedies and the discovery of this new additional one is not bridgeable by statutory construction. The subject-matter jurisdiction and cause of action, now simply inferred, results after forthright judicial debate, but in the entirely wrong deliberative forum.
The shock to legislators and delegates would be all the more profound in the modern light of the unquestionable acceptance of the exclusionary rule. It does not take much imagination to conjure up the operational impact of all filings of motions to suppress being accompanied by notices of claims. This prospect would surely have been "foreign" to legislators and delegates, and the practical and procedural ramifications would have concerned them, to put it mildly, that every grant of suppression  as one example only  carried the potential of a virtually certain civil filing and of monetary recovery in the Court of Claims against the State.
Moreover, if such a vein of tort exposure were to be carefully explored through the full labyrinth of the New York Constitution, some would surely and legitimately also raise questions of judicial impact and resources, weighed against the proportionate societal benefit to be obtained (see, Pitler, op. cit., at 54 ["To Cardozo, the far-reaching consequence of the exclusionary rule  that it would free some of the most serious criminal offenders  was simply too high a price to pay, at least until the Legislature spoke with a clearer voice" [emphasis added]). This case engenders a different price where, again, the Legislature has not expressed, implied or spoken in a clear voice.
The reflections and debate on that feature alone, in the customary legislative fashion, would provoke a reality check on the policy implications of seeding new tort clouds so generously *210 (see, Eisenberg and Schwab, The Reality of Constitutional Tort Litigation, 72 Cornell L Rev 641, 694 [1987]; Rosen, The Bivens Constitutional Tort: An Unfulfilled Promise, 67 NC L Rev 337, 343 [1989]). If this portentous decision were considered and made by the Legislature  as I believe it should be  the judicial impact and resources questions would engender not only serious, respectful debate, but also robust differences of views and particularized, qualified expressions of law, effected through the statutory enactment method, not the inferential, adjudicative interpretive model.

C.
The plaintiffs alternatively argue for an implied private right of action against the State based on violations of article I, §§ 11 and 12 of the New York State Constitution. Heavy reliance is placed upon Bivens v Six Unknown Fed. Narcotics Agents (403 US 388). Bivens held that an individual government agent or officer could be held liable in Federal court for monetary damages as a result of a violation of the Fourth Amendment to the United States Constitution (id., at 397). Whether the government was liable under an implied right of action based on the violation of a constitutional right, however, was not confronted.
That question was presented to the Court in Federal Deposit Ins. Corp. v Meyer (510 US 471). The Supreme Court stated that it "implied a cause of action against federal officials in Bivens in part because a direct action against the Government was not available" (id., at 485 [emphasis added]). The Court noted that "the purpose of Bivens is to deter the officer. * * * If we were to imply a damages action directly against federal agencies, thereby permitting claimants to bypass qualified immunity, there would be no reason for aggrieved parties to bring damages actions against individual officers" (id., at 485). Finally, the Supreme Court instructively noted that:
"Here, unlike in Bivens, there are `special factors counselling hesitation' in the creation of a damages remedy. Bivens, 403 U.S., at 396. If we were to recognize a direct action for damages against federal agencies, we would be creating a potentially enormous financial burden for the Federal Government. * * * [D]ecisions involving `"federal fiscal policy"' are not ours to make [citation omitted]. We leave it to Congress to weigh the implications of such a significant expansion of Government liability" (id., at 486 [emphasis added]).
*211 Using Bivens as a source of authority for what is wrought by the instant holding, yet ignoring its critical limitations as reflected in Federal Deposit Ins. Corp. v Meyer (supra), sidesteps the New York question. The Supreme Court's deference to Congress to fix some boundaries of government liability and fiscal accountability closely parallels this Court's consistent respect for the Legislature's prerogatives in these matters under explicit direction from this State's Constitution. New York now reverses its own prudent history, bucks the Federal trend and even discards the useful guiding lights of many sibling States (see, e.g., Figueroa v State of Hawaii, 61 Haw 369, 382, 604 P2d 1198, 1205-1206; Hunter v City of Eugene, 309 Ore 298, 302-303, 787 P2d 881, 883-884).
Assuming that there was any justification  and none has been persuasively shown  for this Court to combine a transmuted Bivens analysis and the Restatement (Second) of Torts as a joint sourcing for this groundbreaking decision, such an approach should nevertheless be rejected as unnecessary as well as unauthorized. The New York Legislature and the courts of this State already provide effective and adequate remedies for infringements of constitutional rights. Although the range and reach of some of these remedies may be debatable, the policy choices and degree features are not appropriate justification for this Court's magnification of the subject-matter jurisdiction of the Court of Claims  a constitutionally delegated legislative power. Indeed, the suggestion that absent this added judicial remedy against the State some amorphous kind of immunity attaches to the underlying conduct is a chimera; claims in this very controversy remain pending against potentially responsible individuals in appropriate general jurisdiction forums, like State Supreme Court and the Federal courts (see, Brown v City of Oneonta, 916 F Supp 176, 911 F Supp 580, 160 FRD 18).
Given the breadth of the Legislature's specific enactments providing mechanisms to enforce constitutionally guaranteed rights, including the Civil Rights Law (see, e.g., Civil Rights Law § 40-c; Executive Law § 290 et seq.), a judicially created Bivens remedy against the State in the Court of Claims is a significant policy overreach. Indeed, the specificity of remedial legislative enactments and enablements, under standard statutory construction principles, punctuates the argument for some reasonable restraint against the carte blanche invitation inscribed by today's bold precedent.
As a further example, the Human Rights Law regime is rendered substantially unnecessary and the unanimous rationale *212 underlying Koerner v State of New York (62 N.Y.2d 442, 449) is simultaneously made superfluous. If this particular Human Rights Law provision is no barrier to the wider adjudicative interpretive web, then neither are other New York State constitutional provisions under the extended self-executing principle (compare, Pitler, op. cit., at 49-54 [analysis of Civil Rights Law history]).
The plaintiffs assert that the Equal Protection and Search and Seizure Clauses of the State Constitution, though essentially "self-executing," require no specific legislative enablement to energize the Court of Claims remedy and empowerment they now obtain for themselves as a class and for others precedentially. While "it is now presumed that constitutional provisions are self-executing" (People v Carroll, 3 N.Y.2d 686, 691), no precedent from this Court suggests that a private damages remedy may be inferred and promulgated in the loose and unlimited fashion spread under this large and general umbrella.
Inferring subject-matter jurisdiction, in any event, is a far reach even from recognizing a new cause of action, itself no small matter. One would expect strict and rigorous standards to justify inferring  i.e., attributing to the authorized policy-maker, the Legislature  first, a whole new subject-matter jurisdiction for a limited specialized court, and, second, a whole new category of tort liability (not just a duty element). One searches in vain for rigorous analysis and reliable sources justifying such dual, high hurdle attribution (compare, Matter of Tap Elec. Contr. Serv. v Hartnett, 76 N.Y.2d 164, 169 ["courts are reluctant to infer preemption * * * in the absence of an express indication * * * of an intent to do so"], citing Hillsborough County v Automated Med. Labs., 471 US 707, 717-718).
Just as importantly, the judicial rationalization of a need to declare an additional private damages remedy against the State itself, derived from the State Constitution and several other more attenuated and elliptical sources, does not equate to and certainly does not warrant the conferral of subject-matter jurisdiction over such a claim in a court of limited, special powers. The State Constitution itself in article VI, § 9 gives the Legislature the sole authority to determine the monetary claims that may be brought and adjudicated against the State. The cause of action that the majority concedes it needs to "imply" in order to give it life  because it surely is not legislatively expressed  should not prevail over an explicit constitutional imperative and specifically delegated authorization *213 to the Legislature. In any event, such a cause of action should not generally be inferred absent clear, pertinent and unequivocal evidence of the drafters' intent (see, CPC Intl. v McKesson Corp., 70 N.Y.2d 268, 276-277). There is none such in this case.
Whatever the history of the unreasonable search and seizure protection inspires for the long reach of this case, nothing  not one iota of data  can be identified to support a corresponding constitutional tort grounded in the Equal Protection Clause. This prong of the holding concededly represents the farthest extension of all, with extraordinary precedential implications for a host of constitutional claims reduced to torts that may now enter the wells and dockets of Court of Claims courthouses.
In sum, the lower courts correctly held that the Legislature did not invest the Court of Claims with subject-matter jurisdiction and that the State has not consented to stand accountable in that court for alleged violations by its officers and employees of these constitutional police power exertions. This result and rationale should be upheld whether the claims are the egregious type as alleged to have occurred here or the myriad variety of others interspersed throughout the New York State Constitution. Thus, I vote to affirm the order of the Appellate Division in its entirety.
Order modified, etc.
NOTES
[1] The claim was brought as a class action on behalf of two distinct aggrieved classes: Class I, those persons whose names appeared on the computer generated list wrongfully generated by SUCO officials, and Class II, those persons wrongfully stopped, questioned and examined by law enforcement officials in the absence of any articulable suspicion. Only claims involving Class II are being appealed.
[2] The term "constitutional tort" has been attributed to Professor Marshall Shapo who used it in an article on the subject in the Northwestern University Law Review 35 years ago (see, Burnham, Separating Constitutional and Common Law Torts: A Critique and a Proposed Constitutional Theory of Duty, 73 Minn L Rev 515, n 2). It is now used generally by courts and commentators.
[3] The dissent maintains that the Legislature did not intend to broaden the State's existing liability when enacting section 8 of the Court of Claims Act in 1939 (dissenting opn, at 200, citing as authority the Memoranda of Judge Barrett and Senator Feinberg). As a general statement, that is true but what the dissent fails to explain is that section 8 was derived from former section 12-a, the section which was enacted in 1929 to overcome the deficiencies of the statute interpreted in Smith v State (supra). It is essentially the same statute interpreted by this Court in Jackson v State (supra) in 1933. Thus, the 1939 Act did not, as Judge Barrett noted, change the substance of the existing law but the law in effect at the time the Court of Claims Act was enacted in 1939 was certainly not the law interpreted in Smith v State of New York (supra), as the dissent would have us believe.
[4] Claimants alleged the following claims:

Claim 1  Racially motivated violation of Fourth Amendment of United States Constitution, thereby violating 42 USC § 1981;
Claim 2  Racially motivated violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution based on Fourth Amendment violations, thereby violating 42 USC § 1981;
Claim 3  Racially motivated violation of the New York State Constitution, article I, § 12 and New York Civil Rights Law § 8, thereby violating 42 USC § 1981;
Claim 4  Racially motivated violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution based upon violations of article I, § 12 of the New York State Constitution, thereby violating 42 USC § 1981;
Claim 5  Racially motivated violation of article I, § 11 of the New York Constitution and New York Civil Rights Law § 40-c, thereby violating 42 USC § 1981;
Claim 6  Conspiracy to violate civil rights based upon 42 USC 1985;
Claim 7  Racially motivated violation of article I, § 12 of the New York Constitution and New York Civil Rights Law § 8;
Claim 8  Racially motivated violation of article I, § 11 of the New York Constitution and New York Civil Rights Law § 40-c;
Claim 9  Violation of New York State Civil Rights Law § 40-c based upon harassment and discrimination as defined in Penal Law § 240.25;
Claim 10  Violation of Personal Privacy Protection Law, New York Public Officers Law, article 6-A, §§ 91-99 (abandoned on this appeal);
Claim 11  Negligent training and/or supervision of officers and investigators.
[5] 42 USC § 1981 provides:

"(a) All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other. * * *
"(c) The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law."
[6] 42 USC § 1983  "Civil action for deprivation of rights"

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."
[7] Exclusion is now mandated by the application of the Fourth Amendment applying to the States through the Fourteenth Amendment (Mapp v Ohio, 367 US 643).
[8] "§ 11. [Equal protection of laws; discrimination in civil rights prohibited]

"No person shall be denied the equal protection of the laws of this state or any subdivision thereof. No person shall, because of race, color, creed or religion, be subjected to any discrimination in his civil rights by any other person or by any firm, corporation, or institution, or by the state or any agency or subdivision of the state." (NY Const, art I, § 11.)
[9] "§ 12. [Security against unreasonable searches, seizures and interceptions]

"The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized". (NY Const, art I, § 12.)
[10] Civil Rights Law § 40-c states various discriminatory acts and the claim defendants violated Penal Law § 240.25 is asserted purely on the reference to it as a discriminatory act in Civil Rights Law § 40-c.