Edward J. Amann, Jr., J.
This is a claim for damages for personal injuries and property damages allegedly sustained by the claimants as a result of the negligence of the New York State Police.
The claim was filed with the Clerk of the Court of Claims on September 29, 1972 and was thereafter served on the office of the Attorney-General. The claim has neither been assigned nor submitted to any other court or tribunal for audit or determination.
In the early morning hours of September 20, 1972, the claimants, James R. Herman and Carolyn Herman awoke, as was their custom, at approximately 5:30 a.m. Carolyn Herman entered the bathroom to shower, while her husband lay on their bed in a pair of pants and a tee shirt. Suddenly, they heard loud banging noises emanating from the first floor of the house. The couple’s two Boxer dogs, who were in the bedroom, ran down the stairs. Carolyn Herman testified that she was terrified and thought that she was going to be raped or murdered. She further testified that she immediately remembered a murder that had taken place in the city, where the victim’s eyes had been gouged out. Mrs. Herman, who was undressed in the bathroom at the time, put on a bathrobe and went into the bedroom. As she did, she saw men in civilian clothes running up the stairs. It was her testimony, that she heard her husband say, ‘£ Stop, I have a gun.” She also testified to hearing the men on the stairs say, ££ Call off-your dogs or we’ll shoot.” She related that the men had -flashlight's and carried guns. At about the same time she heard the men say, “ State Police ”, which she claims she did not believe. She stated that there were five or six men all of whom were dressed in civilian clothes, except for the last man up the stairs, who was clothed in a State Police uniform. The *1027 intruders then produced a search warrant. The claimant James Herman then stated, “ You want the house across the street.” Ultimately, the raiding party realized that they had made a mistake, but according to the claimants, nevertheless proceeded to search the house. No physical force was used by the police, who remained in the house for approximately 15 to 20 minutes.
The testimony of the claimant, James R. Herman, was substantially the same as that of his wife. He testified that he made the statement, “ Stop, I have a gun ”, although he did not own a gun. He stated that the raiding party consisted of four men dressed in civilian clothes with the exception of the last officer, who had on a State Policeman’s uniform. The claimant further testified that the police, realizing that they had made an error, made a telephone call from his bedroom informing an unknown party of the mistake. While the raiding party was in the house, the claimant testified that he sank to the floor. He also related that during the prior summer he had called the Rochester police, complaining about suspicious activities in the house across the street, commonly known as 2 Audobon Street.
Five days before the raid, Peter Beck, a member of the New York State Police had called the Rochester telephone company and had spoken to Margaret Dreas, an employee of the company. He gave her a list of telephone numbers and requested the names and addresses of the telephone subscribers. Beck testified that he was given the names corresponding to those in the warrant and the house number 3 Audobon Street, the Herman home. Mrs. Dreas’s testimony, however, contradicted this statement. She testified that the telephone records indicated that the telephone number 442-2078 was assigned to Jeffrey Taquino at No. 3 Audobon Street with an additional listing to a Randolph Sterzick. She also testified that she advised Beck that the telephone company’s billing card listed the address at 2 Audobon Street. After the raid, Beck once again called the telephone company, requesting the same information, and at this time he was told that the telephone was located at 3 Audobon Street and that the billing card indicated that the bill was to go to 2 Audobon Street.
Except for a surveillance of the house by a member of the State Police, which lasted less than two minutes, no other attempt was made to verify the names of the occupants of No. 3 Audobon Street. The surveillance consisted of only looking at the house from a distance. The claimants introduced into evidence a Rochester directory wherein the street numbers are followed by the names of the occupants and their telephone *1028 numbers. The claimants ’ name and proper address were listed correctly in the book. This directory is readily available and is in common use in the City of Rochester by attorneys and realtors. In the five days that transpired between the time Beck was given the street address by the telephone company and the raid, no attempt was made by the State Police to ascertain the names of the occupants of 3 Audobon Street.
On the morning in question, a raiding party consisting of New York State Police officers accompanied by one member of the Rochester Police Department broke into the claimants’ home, which was located at 3 Audobon Street, Rochester, New York. During the night and morning of September 20, 1972 the State Police undertook a number of drug raids in the City of Rochester, one of which was at the claimants’ home. Prior to the raid the State Police applied to the Supreme Court of the County of Monroe pursuant to CPL 690.10 for a “ no-knock warrant ”. A supporting affidavit, executed by George M. Falk, a member of the New York State Police, was submitted to the Supreme Court and the warrant was issued on or about the 18th day of September, 1972. In his affidavit officer Falk stated that pursuant to a lawful court order, authorizing a wire tap, he overheard a conversation made to telephone No. 442-2078 listed to Jeffrey Taquino and Randolph Sterzick at 3 Audobon Street, Rochester, New York. The affidavit also stated that the street number was obtained from the Rochester telephone company. The legality of the warrant was conceded by the attorney for the claimants.
At the time of the incident, the claimant, James Herman, was a professor at the College of Fine and Applied Arts at the Rochester Institute of Technology. He was also a professional sculptor. Following the break-in, he did not attend school for several days. It was his testimony that because of the occurrence he felt terrified. He became short tempered, unable to communicate with his fellow workers and isolated from his friends and students. He testified that he was not comfortable in the bedroom of his house and that his sexual relations with his wife diminished. In January of 1973, he was requested by the dean of the college to improve his conduct and attitude. In April of the same year, he was told by the dean and the assistant dean that if he did not change his attitude he would be dismissed. Prior to the break-in he produced a number of art works for use at his place of employment; following the break-in he was unable to sculpt and the number of works he submitted became minimal. He was also relieved of several projects at the school.
*1029 This testimony was corroborated by Dean Robert Johnston, of the College of Fine and Applied Arts at the Rochester Institute of Technology and the Assistant Dean Susan Carter. It was their testimony that prior to the break-in the claimant was an above average faculty member and that following the break-in he became belligerent, upset, and could not get along with his students. Dean Johnston testified that he removed the claimant from various projects at the school’s art gallery and that in 1973 he told the claimant that if he did not improve he would have to dispense with his services. Dean Carter testified that she shared an office with the claimant, who in her opinion was a good teacher and was respected by the students. They had worked closely and co-operated on several art projects. After the break-in, she noticed that the claimant gradually changed and habitually raised his voice and was not at ease. Prior to the break-in she was a close friend of both claimants and visited their home on a frequent basis. Due to the claimants’ behavioral patterns following the break-in, .the visits gradually diminished to the point that she eventually stopped visiting them.
As a result of the feeling of insecurity following the break-in the claimant, James Herman, keeps a foghorn, fire extinguisher, and a bowie knife near his bed.
The claimant, Carolyn Herman, is a high school teacher. She is also a professional painter, according to her testimony. She claimed that after the incident her art work suffered. It was her testimony that now she reacts to noise and has called the police when she has heard a noise in the house. She is afraid to stay home alone and on several occasions has called her husband to come home. Following the break-in she had a sexual problem, which apparently resolved itself when the couple went to Israel in the summer of 1973. Following the incident, the claimant missed one day from school.
On September 29, 1972 Mrs. Herman consulted Dr. Leon J. Canapary, a psychiatrist, who told her to move from the house. The doctor, however, denied that he gave such advice.
Dr. Leon J. Canapary, the psychiatrist who treated the Hermans, testified on their behalf. The doctor is a licensed psychiatrist, who has engaged in the private practice of psychiatry since 1966. He first saw Mrs. Herman on September 29, 1972, at which time he diagnosed her condition as acute traumatic anxiety reaction. He was first consulted by Mr. Herman on September 4,1973, at which time he diagnosed his condition as reactive depression. In answer to a hypothetical question, the doctor testified that the complaints of both claim *1030 ants to wit: sexual diminution, lack of ability to work and to create, irritability, sleeplessness, insecurity, fear and anxiety, were causally connected to the break-in of September 20, 1972.
He related that in September of 1973 the Hermans began to talk about their problems. In the doctor’s opinion, the claimants’ home was a haven of pleasure, a place where they could be creative. It was his testimony that this psychological haven was destroyed by the break-in, causing depression and inability to work and have sexual relations. The husband’s irritability, withdrawal, inability to work, loss of interest, and inability to express himself all were related to depression.
In the summer of 1973, Mr. Herman and his wife went to Israel, resulting in a resumption of sexual relations and a decrease in his depression. The claimants, thereafter, decided to emigrate to Israel and to enter a kibbutz. In the opinion of the doctor the move temporarily restored them to their status before the break-in, because they had found another psychological haven.
On cross-examination, the doctor testified that he had taken case histories from the patients, but did not have the case histories or any records with him. The doctor testified that the claimants’ prior anxiety and insecurity was alleviated when they bought the home and this is why it was necessary to them. He indicated that the wife’s symptoms were similar to a war neurosis. The doctor, however, did not ask her whether she had symptoms before the break-in.
When the doctor first saw Mrs. Herman, her symptoms were resolving. He claimed he gave her no medication because she told him that she was sleeping better. The doctor further testified that the husband had a background of insecurity, which pre-existed the break-in. According to the doctor, his difficulty with his work in school was caused by depression. The symptoms began to resolve by February of 1974, because the Hermans had a desire to emigrate to Israel and live in a kibbutz. The doctor stated, however, that when they get there, their symptoms will reappear. The cost of his services for treating both claimants was $245, but he testified that he did not know which of them paid the bill.
Recognizing the right of privacy, section 12 of article I of the New York State Constitution states in part:
“ The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particu *1031 larly describing the place to be searched, and the persons or things to be seized.”
In the tumultuous times in which we live, we must yield some individual civil liberties in order to protect the majority of our citizens. In furtherance of this objective, the New York State Legislature reluctantly amended the Code of Criminal Procedure to provide that certain search warrants may be executed by forceable entry. Needless to say, this is a very drastic procedure. In view of the harshness of the statute, it should be the obligation of our police officials to make a thorough and precise investigation when securing the facts and evidence upon which supporting affidavits are based; to do less is not only a violation of our civil liberties, but is also a fraud upon the court.
In the case at bar the State police obtained a “ no-knock warrant” based upon information obtained merely from a telephone call to the Rochester telephone company. No steps were undertaken to verify the information and to ascertain whether they were executing the warrant upon the right parties at the right house.
The trial record amply demonstrates that the State Police conducted a negligent investigation and as a result damaged the claimants. The only remaining question, therefore, is whether the State of New York is responsible in damages to the claimants for the acts of its employees. This question was answered by Judge Fuld in the case of Bing v. Thunig (2 N Y 2d 656, 666) wherein he stated:
‘ ‘ The doctrine of respondeat superior is grounded on firm principles of law and justice. Liability is the rule, immunity the exception. It is not too much to expect that those who serve and minister to members of the public should do so, as do all others, subject to that principle and within the obligation not to injure through earlessness. * * * Insistence upon respondeat superior and damages for negligent injury serves a two-fold purpose, for it both assures payment of an obligation to the person injured and gives warning that justice and the law demand the exercise of care.”
The court, therefore, finds the State negligent and the claimants free from contributory negligence and further finds that the negligence of the State was the proximate cause of the claimants’ injuries.
On the issue of damages, the doctor testified to the fact that both claimants were insecure prior to the break-in; he did not, however, obtain detailed histories from the claimants nor did he treat, the claimants prior to the break-in, he, therefore, was *1032 unfamiliar with the status of their mental health before the event. No tranquilizer or anti-depressants were prescribed because at the time the doctor saw the claimants their symptoms were resolving. There was no testimony as to the permanency of the claimants’ injuries, except for the statement by the doctor that when the claimants emigrated to Israel they would become unhappy and that their depression would return.
Prior tó July 7, 1961, following the precedent of Mitchell v. Rochester Ry. Co. (151 N. Y. 107) courts would not grant damages for mental disturbance or fright unaccompanied by physical impact. The Court of Appeals, however, in the case of Battalla v. State of New York (10 N Y 2d 237) overruled the Mitchell case, stating that a claimant could recover for mental illness negligently induced. The evidence adduced at trial clearly indicated the genuineness of the claimants’ illness.
At the end of the case the claimants ’ attorney made a motion to conform the pleadings to the proof. The court granted the motion. The Attorney-General at that time made a motion to dismiss the claim; the court reserved decision. The motion to dismiss the claim is now denied.
After due consideration of all testimony and evidence presented at trial the court fixes the damages as follows:
To the claimants James R. Herman and Carolyn Herman jointly the sum of $376.64 as damages for property damage to their jointly owned home.
To the claimant James R. Herman the sum of $245 as special damages for physician’s services rendered to both claimants.
To the claimant James R. Herman the sum of $10,000 as damages for all general damages including but npt limited to fear, shock, depression and any other mental illness suffered by him resulting from the negligence of the defendant and for all similar injuries or inflictions to be suffered to him in the future. The award also includes all damages for loss of consortium and loss of services of his wife the claimant, Carolyn Herman.
To the claimant Carolyn Herman the sum of $4,000 as damages for all general damages including but not limited to fear, shock, depression and any other mental illness suffered by her resulting from the negligence of the defendant and for all similar injuries or inflictions to foe .suffered by her in the future. The award also includes all damages for loss of consortium and loss of services of her husband the claimant, James R, Herman.