Nicole SOLIS, et al., Plaintiffs,

v.

CITY OF COLUMBUS,
et al., Defendants.

No. 2:02–CV–788.

United States District Court,
S.D. Ohio,
Eastern Division.

May 26, 2004.

Jinx Statler Beachler, Bidwell & Beachler—2, Suzanne M. Stasiewicz, Columbus, OH, for Plaintiffs.

Joshua T. Cox, Paula Jennings Lloyd, Columbus City Attorney's Office—2, Columbus, OH, for Defendants.

## OPINION AND ORDER

MARBLEY, District Judge.

### I. INTRODUCTION

This civil rights case is before the Court on Defendants' Motion for Summary Judgment. Defendants, City of Columbus (the "City"), Mayor Michael Coleman, Department of Public Safety, Safety Director Mitchell Brown, Columbus Police Department (the "CPD"), and Chief of Police James Jackson, seek summary judgment in their favor as to the entirety of Plaintiffs' claims. For the following reasons, the Court **GRANTS** in part and **DENIES** in part Defendants' Motion for Summary Judgment.

### II. FACTS

On Sunday, August 12, 2001, at approximately 10:30 a.m., Columbus Special Weapons and Tactics ("SWAT") team officers executed a no-knock search warrant at 120 South Dakota Avenue in Columbus. While 120 South Dakota Avenue was the address listed on the search warrant, it was not the address that had been targeted by investigators. In other words, the SWAT team entered the wrong house.

The search warrant had been obtained based on the affidavit of Robbery Squad Detective Edward Cox. Cox had been investigating a series of home invasion robberies. On August 10, 2001, a confidential informant contacted Cox with information about these robberies. The confidential source provided detailed and accurate information about the robberies, informed Cox that Jason Walker had been talking about having performed the robberies, and stated that she had seen some of the stolen property in Walker's home, located at 123 Avondale Avenue in Columbus. The confidential source further stated that some of the stolen property was kept at the home of one of Walker's friends. The informant did not know the address of Walker's friend's house, but she told Detective Cox that it was directly behind Walker's residence. She described it as a multi-unit dwelling with a fire escape, facing the alley, with an awning of some sort over the

door and situated between two light colored houses.

The confidential informant told Cox that Walker carried a Ruger handgun on him at all times. She also stated that Walker was very paranoid about anyone watching him and was familiar with unmarked, police-type vehicles. Based on this information, Cox forwarded the information on the second house to the SWAT team to obtain the address. He did not drive by the location himself to verify the address because he did not want to arouse the suspicion of either Walker or his friend. Likewise, the confidential informant was not driven by the location because of the risk that she would be identified by either of the suspects.

On August 11, 2001, the SWAT team scouted the location of the second house. The team informed Cox that the address of the house that matched his description was 120 South Dakota Avenue. The house was described as being a double, with one apartment on the first floor and another apartment on the second floor, and as having light lime green siding with white trim. Somehow, it was determined that the suspect's residence was on the first floor.

With the address provided by the SWAT team, Cox, on August 12, 2001, swore out a search warrant affidavit for the search of 120 South Dakota Avenue, as well as for the search of 123 Avondale Avenue. The warrants were signed by Judge Van Der Karr. Cox described 120 South Dakota Avenue as "two story, multi unit dwelling, green siding with white trim."

On August 12, 2001, at approximately 10:30 a.m., the two search warrants were executed simultaneously. After the location at 123 Avondale Avenue was secured, Cox went into the backyard of that residence. From there, he could see the SWAT team lined up to enter the house at 120 South Dakota Avenue. Looking at the houses, Cox realized that the house described in his search warrant affidavit might not be the house that was described to him by the confidential informant. He eventually determined that 120 South Dakota Avenue was not the correct location of Walker's friend's residence. From the alley, Cox was able to see that the brick, multi-unit structure located directly behind 123 Avondale Avenue and situated between two light colored buildings was the proper location. A SWAT member later informed Detective Cox that the correct address was 124 South Dakota Avenue.

Meanwhile, however, the SWAT team continued with its execution of the no-knock search warrant on the first floor apartment at 120 South Dakota Avenue. Residing in that apartment and occupying it at the time were Nicole Solis and her daughter Carmen Solis. Nicole Solis was 8½ months pregnant; Carmen Solis was 12 years old. The SWAT team set off a concussive device known as a "flashbang" before conducting an extensive search of the apartment. Once they burst into the apartment, officers held guns to Nicole and Carmen Solis's heads, forced them to the ground, handcuffed them, and subjected them to verbal abuse. Carmen became hysterical and developed a nosebleed. When Nicole attempted to comfort her daughter, the police officers taunted her. The officers became so angry that Carmen feared her mother would be hit. The officers made a number of inappropriate statements, such as "Are we making you late for church?" and "You don't gotta go preach, do you?" The officers otherwise behaved inappropriately while the house was being searched, with one officer putting a Halloween mask on a pole and waving it out of a window, and another officer playing a drum set in the living room. Nicole and Carmen Solis eventually were permitted to kneel, but they were kept in handcuffs for over 45 minutes.

### III. PROCEDURAL HISTORY

On August 9, 2002, Plaintiffs, Nicole Solis in her individual capacity and as next of friend on behalf of Carmen Solis, filed suit against Defendants, City of Columbus, Mayor Michael Coleman, Department of Public Safety, Safety Director Mitchell Brown, Columbus Police Department, and Chief of Police James Jackson. Plaintiffs sought compensatory damages, punitive damages, and attorney's fees based on violations of 42 U.S.C. § 1983 and on common law claims for (1) trespass and conspiracy to commit trespass; (2) invasion of privacy; (3) assault and battery; and (4) infliction of emotional distress. Plaintiffs' § 1983 claim is based on failure adequately to train and/or supervise Columbus police officers in violation of the Fourth and Ninth Amendments to the U.S. Constitution.

On October 15, 2003, Defendants filed a Motion for Summary Judgment. Plaintiffs, in their Memorandum Contra Defendants' Motion, ask only that Defendants' Motion be overruled as to Plaintiffs' § 1983 claims against Defendant City of Columbus and the individual Defendants in their official capacities. Plaintiffs explicitly abandon (1) their claims against Defendants Department of Public Safety and the CPD based upon sui juris; (2) their claims against the individual Defendants, Coleman, Brown, and Jackson, in their individual capacities; and (3) their state law claims. This matter is before the Court on Defendants' Motion for Summary Judgment filed pursuant to Rule 56 of the Federal Rules of Civil Procedure.

### IV. STANDARD OF REVIEW

Summary judgment is appropriate "[i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the non-moving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir.1993). Significantly, in responding to a motion for summary judgment, however, the non-moving party "may not rest upon its mere allegations ... but ... must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P.56(e); *see Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *Searcy v. City of Dayton*, 38 F.3d 282, 286 (6th Cir.1994).

The non-moving party must present "significant probative evidence" to show that there is more than "some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir.1993). Furthermore, the mere existence of a scintilla of evidence in support of the non-moving party's position will not be sufficient; there must be evidence on

which the jury reasonably could find for the non-moving party. *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir.1995) (citing *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505).

## V. ANALYSIS

■ Because Plaintiffs have consented to the dismissal of certain claims, the Court, as an initial matter, **GRANTS** summary judgment (1) as to Defendants Department of Public Safety and the CPD; (2) as to all claims against Defendants Coleman, Brown, and Jackson in their individual capacities; and (3) as to all of Plaintiffs' state law claims. A suit against Defendants Coleman, Brown, and Jackson solely in their official capacities is the equivalent of a lawsuit directed against the City. *See Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Shamaeizadeh v. Cunigan*, 338 F.3d 535, 556 (6th Cir.2003). Thus, all that need be considered by this Court is Plaintiffs' § 1983 claims against the City for failure adequately to train and/or supervise its police officers.

■ Section 1983 provides:

Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. There are two essential elements of a § 1983 claim: (1) there must be a deprivation of the plaintiff's "rights, privileges, or immunities secured by the Constitution and laws" of the United States; and (2) the plaintiff must allege that the defendants deprived him of this constitutional right "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory." *Dunn v. Tennessee*, 697 F.2d 121, 125 (6th Cir. 1982) (citations omitted). By its terms, § 1983 creates no substantive rights; it merely provides remedies for deprivations of established rights. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).

■ A municipality may be liable under § 1983 only if the municipality itself caused the constitutional deprivation. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 691–94, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The doctrine of respondeat superior is inapplicable in § 1983 actions. *Id.* According to the Supreme Court, a municipality is liable for the acts of its employees only where the violation of the plaintiff's constitutional rights stems from a governmental "policy or custom." *Id.* at 694, 98 S.Ct. 2018. Moreover, the official policy or custom "must be the moving force of the constitutional violation in order to establish the liability of a government body under § 1983." *Id.; see also Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (noting that a plaintiff must show that municipal action was taken with requisite degree of culpability and must demonstrate a direct causal link between the municipal action and a deprivation of federal rights); *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir.1993) (stating that plaintiff must identify the policy at issue, connect the policy to the governmental body, and show that injuries were incurred because of the execution of that policy) (citing *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir.1987)).

Defendants contend that Plaintiffs have no evidence that the training or supervisory policies of the City exhibit a deliberate indifference to the rights of the City's inhabitants, as required for municipal lia-

bility. Defendants assert that mere mistakes by individuals who failed to follow proper procedures do not suffice to hold the City liable for constitutional violations under § 1983. Plaintiffs point to three specific training and operational policies that the City could have chosen to implement but did not: (1) a training policy regarding the necessity of the officer in charge of an investigation personally and visually verifying the accuracy of search warrant addresses; (2) an operational policy regarding visual verification of search warrant addresses by the officer in charge of an investigation; and (3) a policy that provides investigating detectives with a list of the location of available unmarked vehicles with tinted windows so that they may personally drive by targeted search warrant locations to verify addresses. Plaintiffs contend that the failure to implement these policies caused Plaintiffs' injuries and constitutes deliberate indifference to citizens' constitutional rights.

 The issue for the Court's decision is whether Plaintiffs have presented sufficient evidence to allow a reasonable jury to find that the City's failure to implement a certain training regimen or operational policy demonstrated the requisite degree of municipal culpability and caused the violation of Plaintiffs' Fourth Amendment rights.[1] Defendants seem to concede, at least at this point, that a Fourth Amendment violation occurred when the SWAT team entered Plaintiffs' home. As the Supreme Court has stated, however,

> Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional

municipal policy.... But where the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the "policy" and the constitutional deprivation.

*Tuttle*, 471 U.S. at 824–25, 105 S.Ct. 2427 (footnote omitted). The City, in other words, may be liable either for having an unconstitutional policy or for making a municipal decision—such as a decision not to provide certain training to its officers—that reflects deliberate indifference to the risk that inhabitants' constitutional rights will be violated. *Brown*, 520 U.S. at 411, 117 S.Ct. 1382 (stating that, absent an unconstitutional policy, plaintiffs must identify a municipal decision that "reflects deliberate indifference to the risk that a violation of a particular constitutional or statutory right will follow the decision"). The Court first will consider whether the City's operational policy regarding visual verification of search warrant addresses is somehow deficient and then will address the adequacy of the City's training of its officers.

## A. Operational Policy

 As a threshold matter, the Court rejects Plaintiffs' contention that the City is constitutionally required to have a policy that demands, in all instances, personal visual verification of a search warrant address by the officer in charge of an investigation. The current written policy regarding verification of search warrant addresses requires a supervisor to review a search warrant prior to its submission to the court to "[i]nsure the location list-

---

1. Defendants are correct that the Ninth Amendment does not confer substantive rights. *Gibson v. Matthews*, 926 F.2d 532, 537 (6th Cir.1991); *see Froehlich v. Wis. Dep't of Corrs.*, 196 F.3d 800, 801 (7th Cir.1999)

("The Ninth Amendment is a rule of interpretation rather than a source of rights."). Plaintiffs' § 1983 claims thus may be based solely on violations of the Fourth Amendment.

ed on the warrant is correct." Defendants contend, and Plaintiffs provide no evidence to the contrary, that the CPD has an unwritten policy that allows a case-by-case evaluation. According to this "policy or custom," while visual verification of addresses by the investigating detective is preferable, there is, in certain instances, a danger that such verification might compromise the investigation. When an investigating officer, in his discretion, determines that such a situation exists, the officer should contact a SWAT unit for assistance in obtaining the address. As a general matter, this municipal policy represents a reasonable balancing of the government's interest in maintaining the secrecy of its investigations and the public's interest in being free from unreasonable searches.[2]

■ Here, however, the search at issue was not a run-of-the-mill search pursuant to a valid warrant. Rather, a "no-knock warrant" was obtained that allowed a paramilitary SWAT team forcibly to enter the apartment listed on the warrant, without knocking and without any announcement of its identity or purpose. The no-knock warrant removed this search from the realm of the ordinary by legitimizing a search that was far more intrusive than the normal police search of a home, in which the police generally are required to knock at the door, announce their identity and purpose, and give the home's inhabit-

ants a reasonable opportunity peaceably to accede to the police entry. *See Wilson v. Arkansas,* 514 U.S. 927, 115 S.Ct. 1914, 131 L.Ed.2d 976 (1995); Mark Josephson, *Fourth Amendment—Must Police Knock and Announce Themselves Before Kicking in the Door of a House?,* 86 J.Crim. L. & Criminology 1229, 1233–34 (1996) [hereinafter Josephson, *Fourth Amendment*]. Because a no-knock search represents such an extreme intrusion, the City may be liable based on its failure to mandate that officers utilize increased care when obtaining a no-knock warrant to ensure that the home raided is the correct one.

Execution of a no-knock warrant arguably represents the ultimate government intrusion into "[t]he right of the people to be secure in their persons, houses, papers, and effects." U.S. Const. amend. IV.[3] Intrusions into the sanctity of the home have long been viewed as at the very core of the rights protected by the Fourth Amendment. *Oliver v. United States,* 466 U.S. 170, 178, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984) ("[T]he Court since the enactment of the Fourth Amendment has stressed 'the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic.' ") (quoting *Payton v. New York,* 445 U.S. 573, 601, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)); *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 5

---

**2.** Indeed, the circumstances here exemplify the situation in which obtaining personal visual verification of an address would not have been advisable. Detective Cox had information that the primary suspect in a series of home invasion robberies was not only armed and dangerous but was extremely paranoid and had specific knowledge of police unmarked vehicles. Based on this information, Cox concluded that the risk of the suspect becoming aware of the investigation should he go himself to verify the address justified the use of SWAT specialists to conduct the visual verification.

**3.** The entire Fourth Amendment reads as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

L.Ed.2d 734 (1961) ("At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion."); *see Berger v. New York*, 388 U.S. 41, 58, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967) (noting that proceeding by search warrant is a drastic intrusion that "must be carefully circumscribed so as to prevent unauthorized invasions of 'the sanctity of a man's home and the privacies of life.' ") (quoting *Boyd v. United States*, 116 U.S. 616, 630, 6 S.Ct. 524, 29 L.Ed. 746 (1886)).

This regard for the home has a sound basis in early English common law and in the justifications for the adoption of the Fourth Amendment. *See Payton*, 445 U.S. at 582 n. 17, 100 S.Ct. 1371 ("We have long recognized the relevance of the common law's special regard for the home to the development of Fourth Amendment jurisprudence.") (citing *Weeks v. United States*, 232 U.S. 383, 390, 34 S.Ct. 341, 58 L.Ed. 652 (1914)); *Ker v. California*, 374 U.S. 23, 51–52, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) (Brennan, J., dissenting) (" 'Now one of the most essential branches of English liberty is the freedom of one's house. A man's house is his castle; and while he is quiet, he is as well guarded as a prince in his castle.' ") (quoting James Otis's comments on the hated writs of assistance that, in large part, led to the adoption of the Fourth Amendment, from William Tudor, *Life of James Otis* 66–67 (1823)); *Miller v. United States*, 357 U.S. 301, 307, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958) (" 'The poorest man may in his cottage bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!' ") (quoting William Pitt's March 1763 address in the House of Commons).

At least as early as 1603, English courts recognized the importance of what modern courts have referred to as the "knock and announce" requirement. *See Semayne's Case*, 5 Co. Rep. 91a, 91b, 77 Eng. Rep. 194, 195 (K.B.1603) ("In all cases when the King is a party, the sheriff (if the doors be not open) may break the party's house, either to arrest him, or to do other execution of the K[ing]'s process, if otherwise he cannot enter. But before he breaks it, he ought to signify the cause of his coming, and to make request to open doors ....."); *see generally Wilson*, 514 U.S. at 931–36, 115 S.Ct. 1914 (examining history of "knock and announce" requirement); *Ker*, 374 U.S. at 47–53, 83 S.Ct. 1623 (Brennan, J., dissenting) (same). The requirement was codified in 18 U.S.C. § 3109, as to federal officers, and had been codified by most states as to their own officers at the time of *Wilson*, 514 U.S. at 929, 115 S.Ct. 1914, which held that the common law "knock and announce" principle forms part of the reasonableness inquiry under the Fourth Amendment.

Several purposes for the "knock and announce" rule, all with an historical basis, have been identified. First, requiring police to announce their purpose minimizes the danger of police entry into the wrong home. *United States v. Ruminer*, 786 F.2d 381, 383 (10th Cir.1986); Josephson, *Fourth Amendment*, at 1235. An announcement before forcible entry gives innocent citizens the opportunity to inform the police of their error—before any adverse consequences. *See also Ker*, 374 U.S. at 57, 83 S.Ct. 1623 (Brennan, J., dissenting) ("Innocent citizens should not suffer the shock, fright or embarrassment attendant upon an unannounced police intrusion.").

Second, providing notice to a home's inhabitants decreases the danger to police from misinformed citizens who mistake the

police for unlawful intruders and on that basis engage in armed resistance to the intrusion.[4] *See, e.g., Miller,* 357 U.S. at 313 n. 12, 78 S.Ct. 1190 (stating that compliance with the federal notice statute "is also a safeguard for the police themselves who might be mistaken for prowlers and be shot down by a fearful householder"); *McDonald v. United States,* 335 U.S. 451, 460–61, 69 S.Ct. 191, 93 L.Ed. 153 (1948) (Jackson, J., concurring) (describing likelihood that armed citizen "in this crime-beset city" would shoot a strange man in plain clothes entering her home); *Launock v. Brown,* 2 B. & Ald. 592, 594, 106 Eng. Rep. 482, 483 (K.B.1819) ("[F]or if no previous demand is made, how is it possible for a party to known what the object of the person breaking open the door may be? He has a right to consider it as an aggression on his private property, which he will be justified in resisting to the utmost."). The "knock and announce" requirement also diminishes the danger to a home's occupants from the entry. *E.g., United States v. Lockett,* 919 F.2d 585, 588 (9th Cir.1990); *Ruminer,* 786 F.2d at 383; *see also Duke v. Superior Court,* 1 Cal.3d 314, 82 Cal.Rptr. 348, 461 P.2d 628, 633 (1969) (en banc) (finding a forced, unannounced entry to be "conducive to a violent confrontation between the occupant and individuals who enter his home without proper notice"); Kenneth B. Nunn, *Race, Crime and the Pool of Surplus Criminality: Or Why the "War on Drugs" Was a "War on Blacks,"* 6 J. Gender Race & Just. 381, 406 (2002) [hereinafter Nunn, *Race, Crime* ] ("Officers may inadvertently harm residents or innocent bystanders by the use of force necessary to effect the sudden entry of targeted buildings.").

Third, the rule "guards against the needless destruction of private property." *Lockett,* 919 F.2d at 588 (quoting *United States v. Bustamante–Gamez,* 488 F.2d 4, 9 (9th Cir.1973)); *see* Josephson, *Fourth Amendment,* at 1235 ("A person should be given the opportunity to voluntarily submit to a search before having his property damaged."). Allowing occupants an opportunity voluntarily to open the door often obviates the need for police to destroy the door with a battering ram. *See Ruminer,* 786 F.2d at 383.

Finally, announcement protects the privacy interests of occupants. Josephson, *Fourth Amendment,* at 1234–35; *see Lockett,* 919 F.2d at 588 (stating that the federal "knock and announce" statute " 'symbolizes the respect for individual privacy summarized in the adage that "a man's house is his castle" ' ") (quoting *Bustamante–Gamez,* 488 F.2d at 9). Occupants have a privacy interest in activities not subject to the warrant, and providing them with a few minutes to put on clothes or otherwise prepare themselves for the entry substantially decreases the intrusiveness of the search. *See, e.g., Richards v. Wisconsin,* 520 U.S. 385, 393 n. 5, 117 S.Ct. 1416, 137 L.Ed.2d 615 (1997) (noting that the brief interlude between announcement and entry with an ordinary warrant "may be the opportunity that an individual has to pull on clothes or get out of bed"); *Hall v. Shipley,* 932 F.2d 1147 (6th Cir.1991) (police, in no-knock entry, interrupted Hall having sex with his girlfriend and detained him in the nude).

■■■ The City clearly was on notice that officers going to the wrong address is

---

**4.** The reasonableness of resisting police who enter without an announcement of their authority is evidenced by the very string of robberies that was under investigation here. In the series of robberies allegedly perpetrated by Walker and two others, the three men, wearing dark SWAT-type clothing (often labeled with "S.W.A.T." or "SHERIFF") would force the door and brandish handguns. They forced the occupants to the floor or held weapons to their heads.

a recurring problem in the execution of search warrants, particularly no-knock search warrants.[5] As early as 1963, Supreme Court Justice Brennan, speaking on behalf of himself and three other Justices, recognized the "very real" possibility that police would be misinformed as to material information and thus raid the wrong home. *Ker,* 374 U.S. at 57, 83 S.Ct. 1623 (Brennan, J., dissenting). In 1970, Congress passed the Comprehensive Drug Abuse, Prevention, and Control Act of 1970 (the "1970 Act"), which, among other provisions, allowed federal magistrates to issue no-knock warrants when they found probable cause to believe that notice might allow suspects to destroy evidence. Pub.L. No. 91–513, § 509(b). During the four year period in which federal no-knock warrants were issued, over 100 newspaper articles were reproduced in the Congressional Record recounting no-knock horror stories. Todd Witten, Wilson v. Arkansas: *Thirty Years After* Ker *the Supreme Court Addresses the Knock and Announce Issue,* 29 Akron L.Rev. 447, 457 (1996) [hereinafter Witten, *Knock and Announce* ]; *see, e.g.,* Andrew H. Malcolm, *Violent Drug Raids Against Innocent Found Widespread,* N.Y. Times, June 25, 1973, at A1 ("Innocent Americans around the country have been subject to dozens of mistaken, violent and often illegal police raids by local, state and Federal narcotics agents in search of illicit drugs and their dealers."). In 1974, Congress voted to repeal the no-knock provision of the 1970 Act by a two-to-one margin. Witten, *Knock and Announce,* at 457.

More recently, reports of no-knock horror stories continue to emerge.[6] *E.g.,* Nunn, *Race, Crime,* at 408 (recounting death of California man who was shot 15 times before either he or his wife knew who was breaking into their home or why); Richard E. Burket, *The State Law Enforcement Apparatus as America: Authority, Arbitrariness, and the "Force of Law" in* Vineland, 24 Okla. City U.L.Rev. 727, 748–49 (1999) (relating several instances of police raiding wrong homes); Josephson, *Fourth Amendment,* at 1257 (describing how police in no-knock raid shot and killed innocent woman, Robin Pratt); *Boston to Give Victim's Widow $1 Million in Wrongful Death Suit,* N.Y. Times, Apr. 25, 1996, at A17 (documenting 1994 Boston incident in which police targeted wrong house and raid resulted in death by heart attack of 75-year-old minister); Joe Hallinan, *Drug Wars: Fervor Often Injures the Innocent,* New Orleans Times–Picayune, Sept. 26, 1993, at A20 (describing ordeal of innocent woman and her 15-year-old daughter who were forced to kneel, in handcuffs, in their underwear for 45 minutes during no-knock raid of their home); American Civil Liberties Union, *"No–Knock" Warrant Resulting in Denver Man's Death Should Not Have Been Issued, ACLU Says* (Dec. 6, 1999), *at http://www.aclu.org/news/News-Print.cfm?ID=8786 & c=51* (describing no-knock warrant that led to death of innocent man, Ismael Mena); Timothy Lynch, *Another Drug War Casualty* (Nov. 30, 1998), *at http://cato.org/dailys/11–30–98.html* (reporting death of innocent man, Pedro Oregon Navarro, shot by police 12 times in no-knock raid); James Bovard, *OOOPS—YOU'RE DEAD ... The body*

---

**5.** Lack of notice can be a defense for a municipality in a § 1983 case. *See, e.g., Brown,* 520 U.S. at 407–08, 117 S.Ct. 1382 (explaining the problem of lack of notice when a municipality is held liable based on a single violation of federal law); *Sargi v. Kent City Bd. of Educ.,* 70 F.3d 907, 912 (6th Cir.1995) (citing lack of notice as a basis for rejecting a claim of inadequate training).

**6.** Listed here are incidents that occurred before the raid at issue in this case; examples of similar incidents occurring after August 12, 2001, also abound.

count from NO–KNOCK DRUG RAIDS is climbing. ARE YOU NEXT?, at http://www.powernet.net/eich1/nok-nock.html (last visited May 21, 2004) (detailing several incidents of no-knock drug raids ending in tragedy); see also Joe Hallinan, Drug Wars: Fervor Often Injures the Innocent, New Orleans Times–Picayune, Sept. 26, 1993, at A20 (quoting law enforcement officials in North Carolina and New Mexico as saying that raids of incorrect houses happen "every day in this business" and "all the time").

Both reported and unreported cases have addressed factual situations that bear uncanny resemblance to the facts here. E.g., Lewis v. City of Mount Vernon, 984 F.Supp. 748 (S.D.N.Y.1997) (police, pursuant to no-knock warrant, searched wrong apartment in multifamily dwelling); Atkins v. City of Carrollton, Civil Action No. 3:95–CV–1424–D, 1997 WL 160297, **1–6, 1997 U.S. Dist. LEXIS 4983, at *1–7 (N.D.Tex. Mar. 27, 1997) (because of verification errors, police raided home seeking previous resident; police forced seven months' pregnant woman to lie on floor on her stomach at gunpoint); McElroy v. United States, 861 F.Supp. 585 (W.D.Tex. 1994) (pursuant to no-knock warrant, police, having failed to check utility records, raided second half of duplex in addition to target apartment, keeping two unrelated persons handcuffed in their boxer shorts for 45 minutes); Rossi v. City of Amsterdam, 274 A.D.2d 874, 712 N.Y.S.2d 79 (N.Y.App.Div.2000) (police executed no-knock warrant on wrong house where officer asked to verify address failed accurately to match physical description of house with correct address); Herman v. State, 78 Misc.2d 1025, 357 N.Y.S.2d 811 (N.Y.Ct. Cl.1974) (police executed no-knock warrant on wrong house where address was obtained by call to telephone company and no verification was performed). According to the article in the Columbus Dispatch that reported the incident that sparked this lawsuit, this is not even the first time that Columbus police have raided the wrong house: in 1990, the police paid a 79–year-old woman $3,100 to replace doors and belongings after a SWAT team mistakenly raided her home, and, according to police, at least three other such incidents have been documented in Columbus during narcotics raids. Matthew Marx and Bruce Cadwallader, Police Raid Wrong Address Looking for Robbery Suspect, Columbus Dispatch, Aug. 15, 2001, at B5.

When such an important right is at issue as the right to be secure in one's home from an unannounced, forcible official entry and search, and when there is such a potential for mistakes—mistakes, as illustrated above, that so readily can have tragic consequences—then a municipality is required to exercise more than usual care. A search conducted pursuant to a no-knock warrant is a hyper-intrusive search that can be analogized to wiretapping, covert video surveillance, and bodily intrusions to extract evidence. Ric Simmons, Can Winston Save Us from Big Brother? The Need for Judicial Consistency in Regulating Hyper–Intrusive Searches, 55 Rutgers L.Rev. 547 (2003) [hereinafter Simmons, Can Winston Save Us ] (describing these searches as qualitatively different than ordinary searches, and thus requiring higher constitutional standards). These searches are all so invasive of privacy or dignity that courts have held that the government must show more than the standard requirement of probable cause in order to obtain a warrant. Id. at 550, 560 ("[W]hen a search technique is extraordinarily intrusive, the reasonableness clause of the Fourth Amendment could impose extra limitations ...."); see, e.g., Richards, 520 U.S. at 394, 117 S.Ct. 1416 (stating a higher-than-probable cause standard for no-knock warrants); Winston v. Lee, 470 U.S. 753, 759,

105 S.Ct. 1611, 84 L.Ed.2d 662 (1985) (holding that a compelled surgical intrusion into an individual's body for evidence implicates expectations of privacy and security of such magnitude that the intrusion may be unreasonable even if likely to produce evidence of a crime); *United States v. Torres,* 751 F.2d 875, 883 (7th Cir.1984) (Posner, J.) (stating, in reference to covert video surveillance, that "a search could be unreasonable, though conducted pursuant to an otherwise valid warrant, by intruding on personal privacy to an extent disproportionate to the likely benefits from obtaining fuller compliance with the law").

 Just as something more than probable cause is required in order for a hyper-intrusive search to be reasonable, so something more than usual care in the execution of such a search is constitutionally required. *Cf. Holland v. Harrington,* 268 F.3d 1179, 1194 (10th Cir.2001) ("If anything, the special circumstances and greater risks that warrant 'dynamic entry' by a SWAT team call for *more* discipline, control, mindfulness, and restraint on the part of law enforcement, not less."). In order for a municipality's policy to be reasonable under the Fourth Amendment, the municipality must require its officers to be particularly vigilant in executing an extraordinarily intrusive search. Here, that requirement translates into a need to take extra care to ensure that the SWAT team is invading the correct house when it acts

pursuant to a no-knock warrant. This requirement can be analogized to the principle that wire, electronic, or video surveillance must be conducted so as to minimize the interception of irrelevant information.[7] In the context of a no-knock search, the need to minimize the "interception" of irrelevant information may be viewed as a requirement that the correct house be searched. By increasing the likelihood that police have the correct address, a city may minimize the possibility that a wholly unnecessary search occur.

Part of the rationale for the "knock and announce" requirement is that it decreases the chance that police will enter the wrong house. When the police knock at the door and announce their authority, innocent citizens have the opportunity to explain the mistake. When the search is conducted pursuant to a no-knock warrant, however, the invasion and any attendant danger, humiliation, and fear has already in large part occurred before an inhabitant has any opportunity meaningfully to protest his innocence. Since a no-knock warrant eliminates this safeguard against the wrong house being invaded, the municipality should provide an additional safeguard to take its place. Because, under a no-knock warrant, a citizen loses the protection that would prevent the wrong house from being raided, the city should provide the citizen with the alternative protection of greater

---

**7.** Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title III") regulates interception of all oral and wire communications. 18 U.S.C. §§ 2510–22. Title III was enacted in response to *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), which struck down as unconstitutional a New York statute that permitted electronic eavesdropping based on a mere showing of probable cause. Simmons, *Can* Winston *Save Us,* at 552–55. Among other provisions, Title III requires that the surveillance be conducted in a way that minimizes the interception of irrelevant information. 18 U.S.C. § 2518(5).

In 1986, Congress passed the Electronic Communications Privacy Act (the "ECPA"), which amended Title III to include protections for electronic communications. The language of the ECPA set the same requirements for electronic communications as already existed in Title III for oral and wire communications. With the advent of video surveillance, most, if not all, courts have used the Title III safeguards to define the scope of the Fourth Amendment requirements for such "searches." Simmons, *Can* Winston *Save Us,* at 558, n. 58 (citing cases).

care being taken to ensure that the targeted address is correct before the warrant issues.

The governmental interest in *not* having in place some sort of procedural safeguards to prevent terrifying and potentially tragic invasions of the wrong homes seems to this Court to be slight. When compared with the interest of innocent citizens in not undergoing the sort of ordeal experienced by Nicole and Carmen Solis,[8] the Court has no problem in concluding that a jury could find the City to have been deliberately indifferent to the rights of its inhabitants by failing to have such a policy. Some of the same issues are present with regard to confidential informants. The danger of receiving inaccurate information from such sources and the significance of the potential consequences of such information have led many municipalities, including the City of Columbus, to adopt specific policies requiring tips from confidential sources to be confirmed before they are acted upon. The City requires its officers to take particular care in evaluating information received from confidential informants. A similar requirement with regard to the accuracy of information used in obtaining no-knock warrants could well have averted this unfortunate incident.

In determining whether the requisite causal link exists between the City's deficient policy, as outlined above, and the violation here, the question is whether a reasonable jury could find that the viola-tion occurred because of the policy (or the City's action in failing to promulgate a necessary policy). The CPD's conclusion following its internal investigation into this matter was that mistakes were made by individuals who were not following appropriate procedures. The violation of Plaintiffs' rights apparently occurred because Cox did not relay all identifying information to the SWAT officer who conducted the visual verification and because Cox's supervisor did not, as per department policy, further scrutinize the warrant because the information came from a confidential source. The Court declines to micromanage the CPD as suggested by Plaintiffs. Plaintiffs argue that there should be policies that require a detective to advise his supervisor that he did not personally perform a visual verification in the event a specific address is not obtained; that require a written description to be provided to SWAT in the event a requesting officer is unable personally to conduct a drive-by of the location; that insure that SWAT has accurate information in such a situation; and that provide investigating detectives with a list of the location of available unmarked vehicles with tinted windows so that they may personally conduct a drive-by. While some of these proposed policies might be advisable, none of them, standing alone, is constitutionally required.[9]

What is required is that the municipality mandate that more than ordinary care be taken when an extraordinarily intrusive

---

**8.** The facts as alleged by Plaintiffs exemplify "the casual arrogance of those who have the untrammelled power to invade one's home and to seize one's person," as decried in *Mapp v. Ohio*, 367 U.S. 643, 671, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961) (Douglas, J., concurring).

**9.** The issue is not whether the Court can conceive of a better policy; the issue is whether the municipality's current policy is either unconstitutional or is so deliberately indifferent to the constitutional rights of its inhabitants that § 1983 liability is warranted. *See City of Canton v. Harris*, 489 U.S. 378, 392, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("In virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident.") (citing *Tuttle*, 471 U.S. at 823, 105 S.Ct. 2427 (opinion of Rehnquist, J.)).

search, such as the search at issue here, is contemplated. A reasonable fact finder could find that if either Detective Cox or the SWAT team member who verified the address of the home on South Dakota Avenue, in recognition of the extreme intrusiveness and potential irreversibility of the search, had taken extra care, then the constitutional violation would have been averted. The situation could have been avoided in any number of ways, if the officers had taken certain precautions. Plaintiffs point out some of these possible precautions, but there may have been others. The issue is not as simple as whether Cox verified the address himself, or whether an unmarked vehicle with tinted windows was available. The evidence reveals that Cox simply was not, in several small ways, as careful as he could have been. But why should he have been more careful, when there was no City policy requiring it? A reasonable jury also could find that, had such a policy been in place, Cox would have given the additional attention to accuracy that would have led to a different result.

For the foregoing reasons, Defendants' Motion for Summary Judgment is **DENIED** as to the City and the individual Defendants in their official capacities based on the City's failure to have in place an operational policy that would require more than usual care to be taken in the interests of obtaining an accurate address for the no-knock search warrant that led to the violation of Plaintiffs' rights.

## B. Training Policy

The Supreme Court has limited § 1983 actions for the inadequacy of police training, reasoning that "[o]nly where a municipality's failure to train its employees in a relevant aspect evidences a 'deliberate indifference' to the rights of its inhabitants can such shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Shamaeizadeh v. Cu-nigan*, 338 F.3d 535, 557 (6th Cir.2003) (quoting *Harris*, 489 U.S. at 389, 109 S.Ct. 1197). Section 1983 liability against a municipality may not be imposed unless "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policy makers of the [governmental body] can reasonably be said to have been deliberately indifferent to the need." *E.g., Carey v. Helton*, No. 01–5623, 2003 WL 21525115, at *2 (6th Cir. July 2, 2003) (quoting *Harris*, 489 U.S. at 390, 109 S.Ct. 1197), *cert. denied sub nom., Carey v. Knox County*, —— U.S. ——, 124 S.Ct. 1506, 158 L.Ed.2d 153 (2004); *see Whitlow v. City of Louisville*, No. 00–6557, 2002 WL 1455317, at *4 (6th Cir. July 1, 2002) ("Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. A showing of simple or even heightened negligence will not suffice.") (internal quotation marks and citations omitted); *see also Harris* at 391, 109 S.Ct. 1197 ("[P]lainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.").

The mere allegation "that a different training program than the one in place would have been more effective" will seldom suffice to survive summary judgment. *Grazier v. City of Phila.*, 328 F.3d 120, 125 (3d Cir.2003) ("The scope of failure to train is a narrow one . . . . [T]he plaintiffs must present evidence that the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the policymaker's failure to respond amounts to deliberate indifference.") (internal quotation marks and citations omitted); *Lewis v. City of Irvine*, 899 F.2d 451, 455 (6th Cir.1990) (noting that whether the training was the best and

most comprehensive available has no bearing on a plaintiff's failure to train claim).

 In addition to being subject to § 1983 liability based on its deficient operational policy, as outlined above, the City also may be liable, for the same reasons, based on its failure to train officers to comply with that policy. In other words, the jury may find the City liable for its failure to train officers to exercise something more than ordinary care when obtaining addresses for no-knock search warrants.[10]

As an alternative ground for § 1983 failure to train liability, a reasonable jury could find a more general deficiency in the City's training regimen. Plaintiffs have adduced evidence that the relevant Basic Criminal Investigation Class for officer training does not specifically address the visual verification of addresses when obtaining a warrant.[11] There is no specific training policy regarding the issue; it is addressed only when a trainee happens to ask the question during class. Even in that instance, the instructor can not provide the trainees with any specific policy but can only advise the trainees regarding his own practice. In response, Defendants

offer two affidavits. Officer James McCoskey, who has conducted training on search warrants for nine years, states that the training emphasizes the Fourth Amendment. Commander Paul Denton states that the CPD trains officers in the procurement and execution of search warrants for the purpose of protecting the constitutional rights and safety of the public as well as to protect the safety of officers and to accomplish the purpose for which the warrants are obtained.

Plaintiffs have presented sufficient evidence from which a reasonable jury could find that the City has shown deliberate indifference by virtue of its failure to train officers regarding the importance of having a correct address on a search warrant and procedures that will provide reasonable assurance that the address is correct. The rights at issue here are so important that the ad hoc practice of training officers to protect these rights, as described by McCoskey in referencing his training on the visual verification of addresses, is not acceptable.

 Defendants attempt with their two affidavits to counter Plaintiff's evidence re-

10. Because the Court already has held that the City is not subject to liability for its failure to have a policy requiring search warrant addresses always to be personally visually verified by the officer conducting an investigation, the Court rejects Plaintiffs' contention that the City should be liable for its failure to provide training in accordance with such a policy.

11. Plaintiffs rely on an email exchange between Sgt. Jeffrey Sharrock, who conducted the internal investigation of this incident, and Officer James McCoskey, who taught the class on search warrants that Cox attended. Sharrock asked McCoskey for a copy of his lesson plan for the class, stating that he needed to know "if, during this class, you instructed the students at anytime that the officer requesting, completing, and signing a search warrant would have to *always* personally verify the

address listed on a search warrant by their own *visual observation* before obtaining the search warrant." If they were not so instructed, then Sharrock wanted to know if "there was any instruction on when or if the students should personally verify the address or when it would be acceptable to obtain the address through other means." McCoskey responded that he had a lesson plan outline, but that the outline "does not specifically address" the question. McCoskey stated that in the "many times over the years" he has taught the class, "once in awhile" a similar question would arise. McCoskey indicated that when that question is asked, he informs the students of his personal practice, which has been not always personally to view the location but sometimes to use reliable information from other detectives or uniformed officers.

garding the inadequacy of police training. These affidavits, however, offer little more than broad conclusions and therefore are practically useless on summary judgment. *See, e.g., Cincinnati Bell Tel. Co. v. Allnet Commun. Servs., Inc.*, 17 F.3d 921, 924 (6th Cir.1994) (conclusory affidavits insufficient to withstand summary judgment). Mere statements that officers are trained in search warrants and that the training emphasizes the Fourth Amendment are insufficient to counter Plaintiffs' specific attack on the adequacy of the training. The Court notes that training regarding the legal requirements of the Fourth Amendment is all but meaningless if officers are not then taught, in a practical sense, how to ensure that those legal requirements are met.

Plaintiffs have adduced evidence from which a reasonable jury, could infer that Detective Cox was given little or no guidance to assist him in understanding the importance of having the correct address on a warrant, particularly when that warrant will be executed by a SWAT team in a no-knock fashion, or to prepare him for making the discretionary judgment call as to when the facts of a situation call for verification of an address by an officer other than himself. More importantly, Cox was apparently provided no training on the steps he should take, once the decision for SWAT team address verification had been made, to insure that the SWAT unit had all available information about the location and, once it returned from the scouting mission, to insure that the address obtained was correct based on all known data. A reasonable jury could reach the conclusion that this inadequacy in Cox's training was the moving force behind the violation of Plaintiffs' Fourth Amendment rights.

Because an obvious consequence of this failure to train would be officers who, like Cox, are inadequately prepared to oversee another officer's address verification, a jury could find that the City was guilty of deliberate indifference based on its failure to provide such training. In *Brown*, the Supreme Court noted that, in certain circumstances, "a violation of federal rights may be a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). The Court went on to state that, in such an instance,

> The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected "deliberate indifference" to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right.

*Id.* The need occasionally to have another officer complete the visual verification of a search warrant address is a recurring situation in law enforcement. The constitutional violation that occurred here is a predictable result of the failure to give officers the tools to handle this situation by training them in how to insure that information is fully and accurately transmitted and that the final address obtained is correct.

For the foregoing reasons, Defendants' Motion for Summary Judgment is **DENIED** as to Plaintiffs' § 1983 failure to train claim against the City and the individual Defendants in their official capacities.

## VI. CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' Motion for Summary Judgment as to Plaintiffs' § 1983 claims against the City and the individual

Defendants in their official capacities and **GRANTS** Defendants' Motion as to all other claims.

**IT IS SO ORDERED.**